AYLWARD *et al.* v. BRIGGS *et al., Appellants.*

Division Two, October 17, 1898.

**Will**: CORROBORATIVE FACTS: MENTAL CAPACITY. Where there was evidence on the part of the contestants to show that the testator's memory had become so treacherous that he did not know his near neighbors nor recall their names; that he had become, at the time of making the will, much enfeebled by old age and a chronic disease in the head; that when his son, his favorite child and only devisee, was dangerously and critically sick he had left his home and remained at a neighbor's house for a week, merely because his daughters had returned to nurse their brother; that since the marriage

Aylward v. Briggs.

of his daughters to reputable citizens he had refused to speak to them or to see them, simply because they had married against his will, and was otherwise unnatural in his conduct towards them—where these facts exist, if believed, the jury is justified: *First*, in accepting the opinion of those who testified that, in their opinion, founded on a long acquaintance and social intercourse with the testator, he had become so enfeebled in mind that he no longer knew the extent of his property, and was not competent to dispose of it among those who would naturally be the objects of his bounty; *second*, in considering the will itself as corroborating this evidence of incapacity, since it disinherited the one surviving daughter and the three orphan girls of the deceased one, who were wholly without means.

2. ———: INEQUALITIES. If a testator is found to have testamentary capacity, the inequalities of his will, the giving of a large estate to a favorite child and disinheriting the others, constitute no ground for setting his will aside.

3. ———: UNDUE INFLUENCE: INSTRUCTION. Where all the evidence shows that the will was made in pursuance of a long cherished desire of the testator to recompense his son for giving up his business in a distant State and returning to him at his request, and caring for him and his wife during their declining years, the court should instruct the jury that there was no evidence of undue influence.

4. ———: ———: BURDEN ON DEVISEE. An instruction that imposes on the defendant devisee the burden of establishing that the will was voluntary and without undue influence from him, and requiring him to account for the inequalities in the legacies, is glaringly erroneous.

5. ———: EVIDENCE. The principal devisee was asked if he did not think the will unjust. *Held* that the question was highly improper.

*Appeal from Scotland Circuit Court.*—HON. BENJAMIN E. TURNER, Judge.

REVERSED AND REMANDED.

*Smoot, Mudd & Wagner* for appellants.

(1) Where the formal execution of a will is proved and the subscribing witnesses testify to the proper age and sanity of the testator, the law presumes that he was possessed of testamentary capacity, and without substantial evidence to the contrary the court should not submit the issue to a jury. *McFadin v. Catron*,

138 Mo. 197; *Couch v. Gentry*, 113 Mo. 248. (2) There was no evidence of undue influence, much less that influence that the law denounces, no over-persuasion, coercion or force that would overcome the will and destroy free agency. *Jackson v. Hardin*, 83 Mo. 175; *Rankin v. Rankin*, 61 Mo. 295. (3·) It is the generally accepted doctrine that the burden of proving that a will is the result of undue influence is upon the party alleging it. *Carl v. Gabel*, 120 Mo. 283; *Morton v. Heidorn*, 135 Mo. 608. (4) The existence of motive and opportunity for undue influence will not in the absence of affirmative evidence of its exercise be sufficient. *Brinkman v. Rueggesick*, 71 Mo. 553; *Sunderland v. Hood*, 84 Mo. 293; *Myers v. Hauger*, 98 Mo. 433; *Cundy v. Cundy*, 68 N. Y. 148; *McFadin v. Catron*, 138 Mo. 197. (5) The instruction imposing upon the contestee the burden of showing want of undue influence was and is not the law in this case. *Berberet v. Berberet*, 131 Mo. 399; *Morton v. Heidron*, 135 Mo. 608; *McFadin v. Catron*, 120 Mo. 252; *Maddox v. Maddox*, 114 Mo. 35. (6) A testator having sufficient mental capacity has the right to make an unreasonable, unjust and injudicious will. *Bylin v. Meeker*, 15 N. J. Eq. 310; *Farmer v. Farmer*, 129 Mo. 530; *Jackson v. Hardin*, 83 Mo. 185. (7) The question propounded to W. P. Briggs that if he did not believe the provisions of the will unjust, against the objections of proponents, was improper. *McFadin v. Catron*, 120 Mo. 252.

*J. M. Jayne* for respondents.

(1) The appellate court will not review the action of the trial court in refusing instructions, unless the appellant shows and sets out wherein said instructions were or should have been given. *Sage v. Tucker*, 51 Mo. App. 336; *Lindsey v. Dixon*, 52 Mo. App. 291.

(2) The instructions given fairly presented the case and cover every phase of it in the light of the evidence. *Fugate v. Millar*, 109 Mo. 281. (3) The jury passed upon the questions of whether or not James Briggs was competent to make a will and whether or not he was induced to make said supposed will by undue influence. These were questions of fact for the jury. (4) The verdict was for the right party and the judgment should be affirmed.

GANTT, P. J.—This is a proceeding to set aside the last will and testament of James Briggs, deceased, late of Scotland county.

An issue of *devisavit vel non* was framed and submitted to a jury at the February term, 1896, of the Scotland circuit court, and a verdict rendered declaring the writing propounded was not the last will and testament of said James Briggs. The facts, so far as they are deemed necessary to be stated, are that James Briggs in his early life was apprenticed to a carpenter to learn his trade and served until he was twenty-one years old. He worked at his trade, but also developed a strong desire for a liberal education, and soon after he came west he was teaching school, and continued to be a great reader until his death at the age of eighty years. He came to Scotland county in 1848 and resided there until his death with the exception of three years spent in seeking gold in California, from 1850 to 1853. He was married and three children were born to him, one son and two daughters. His wife died two years prior to his own demise. He owned a farm of five hundred and fifty acres in Scotland county, estimated to be worth $16,000, subject to a mortgage of $800, and a general indebtedness of about $1,200 more. In 1886 he executed the will in contest. He devised two hundred acres of his land to his wife for her life, and gave

her all his household goods.   He gave all the remainder of his property,  real and personal,  to his son William  P.  Briggs  and  charged  him with  the  payment of $20 each to  his three grandchildren, Edna, Mary F. and Emma  Aylward,  when  they  respectively  reached their majority,  and  $50  to his daughter,  Mrs.  Harriett A. Critz.    After the death of her father Mrs. Critz settled with  her  brother,  William  P.  Briggs,  and  accepted $500 in full  of her claims to a share in the estate.

The plaintiffs in this  case  are the children of  the deceased  daughter Mrs. Aylward, and the defendants, the son, Wm. P. Briggs, and the other daughter, Mrs. Critz.   James Briggs died in 1892, some  six  years after the execution of his  will.   The will was attested by  John  W.  Barnes,  the  cashier  of  the  Scotland County National Bank  of Memphis, and W. A. Cox, a merchant of Memphis.   It was  admitted to probate in December,  1892.   This  action  was  commenced  in August, 1895.   The petition alleges that  the testator was of unsound mind and incapable of executing a will, and that the will was  procured by the undue influence of William P. Briggs, the principal devisee. It appears from the evidence that the testator was violently opposed to the marriages of each of his daughters, and after their  marriage refused to  be reconciled  to them. It seems  that though  they lived in the same neighborhood  he  never  visited  either  of them in  their own homes, and when they came to his house to  visit their mother, who was  greatly afflicted with a  cancer in her old age, he would  leave home or  go into another  part of the house and refuse to see them.

His son, William P. Briggs,  left home about 1877 to seek his fortune in California.   In 1879 the testator wrote him and urged  him to come home and take care of his father and  mother,  pay the debts and he should have the farm.   William P., in response to this letter,

came home, took charge of the farm, which was in a dilapidated condition, remodeled the house, built a new barn and cribs and other farm houses, rebuilt the fences, cleared the land and put the worn-out land in clover. He married, and he and his wife cared for the two old people until they died, the mother in 1890 and his father in 1892. The testimony without contradiction establishes that they were attentive and affectionate and did all that was possible to render the old people comfortable. The testator's wife was an invalid, and the son took her to two different sanitariums for treatment, and paid all the expenses, amounting to several hundred dollars. The evidence also established that James Briggs was a very poor farmer. His taste led him in a different direction. He was a man of strong political views and was a local leader in his party. When his son returned he turned over the farm to him to manage. When it was necessary to obtain money to carry out their plans, he would execute the necessary papers, but he left the practical management entirely to his son. The will was drawn by an attorney in Memphis. The son was not present at the time. After it was signed and attested, it was left with the cashier of the bank in Memphis, to be delivered to his executors after his death. The formal proof of the execution, attestation and the soundness of the testator's mind, was made by the two subscribing witnesses and was clear and satisfactory.

On the part of the plaintiffs the evidence tended to prove the unnatural feeling of the testator toward his daughters and their children in refusing to visit them or speak to them when visiting at his house. The testimony of his daughter was that as far back as she could remember he was afflicted with a constant pain in his head of which he complained, and of an unnatural

Vol. 145 mo—39

discharge from his nose, and that on one occasion he acted so strangely that the family were alarmed and sent for a neighbor, one Ingersall, to come and stay with them. His conduct was peculiar and the family could not understand it. Ingersall testified also that he went to the testator's house that night; that William P. came after him, and said his father was crazy. When he reached the house the testator looked wild and declined to speak to him, although they were very friendly and old neighbors. He got down on his hands and knees and jumped and leaped around and made a peculiar noise, described, by the witness, as a "whoo, whoo." This witness and others testified that when his son was dangerously sick on one occasion, the testator left home and remained away a week because his daughters had come to nurse their brother. He would waylay the doctor and inquire about the boy, and get others to go to the house and inquire. He hid himself in the corn until his daughter passed him. Other witnesses testified that he talked at random at times, so much so they considered him childish. Others that as he grew older he became more and more enfeebled in his mind, but they would not go so far as to call him insane. Several old men who had known him many years testified that in their opinion his memory and mind had so failed that he did not have sufficient mental capacity to comprehend and know the extent and character of his property and the claims of those dependent upon his bounty.

George Roberts testified that he had lived in the neighborhood of the testator, had often met him and conversed with him at testator's home. Witness married one of testator's pupils. He removed from the neighborhood and remained several years. After his return in 1883 he met testator, shook hands with him, and told him who he was. Testator could not remem-

ber him.   Said no such person had ever resided in the neighborhood, and when told that witness' wife went to school to him, he could not remember her.   He considered testator cranky.   Defendants in rebuttal offered considerable testimony, showing that testator was a man of exceedingly strong will power and of sufficient mind and memory to transact business, and to know the nature and extent of his property, and all his children and grandchildren, and to dispose of his property by will.

I.   At the close of plaintiff's case the defendants and proponents offered two instructions.   The first was a peremptory declaration that under the law and the evidence the jury must find the paper writing propounded was the last will and testament of James Briggs, and the second declared that there was no evidence of undue influence and the finding on that issue must be for defendants.

Before proceeding to the discussion of other propositions in the case these two points should, logically, be disposed of.   The demurrer to the evidence asserts that there was no substantial evidence which would have authorized the jury to find that James Briggs was not of sound mind and disposing memory when he executed his will in 1886.   Unless the jury utterly discredited the subscribing witnesses and other business men who testified, it must be conceded there was ample evidence to sustain the will.   On the other hand if the jury believed the witnesses for the contestants they would have found that the testator was an old man, much enfeebled by old age and a chronic disease in his head; that since the marriage of his two daughters he had acted in a very unnatural manner toward them without any reason other than they had married against his will, there being no evidence that their husbands were not worthy men and reputable citizens; that

at times the old gentleman was positively insane, so much so as to require his wife to call in a neighbor for protection. The jury could also have found that his memory had become so treacherous that he did not know his near neighbors or recall their names; that when his son, his favorite child, was dangerously ill, he had left his home and remained at a neighbor's for more than a week, at the most critical period of his sickness, merely because his daughters, moved by affection for their brother, had returned home to nurse him. The jury could have accepted the opinion of those who testified that, in their opinion from a long acquaintance and social intercourse with the old gentleman, he had become so enfeebled in mind that he no longer knew the character and extent of his property and was not competent to dispose of it among those who would naturally be the objects of his charity. Having all these circumstances before them, they might in connection therewith have considered the will itself, and have concluded that the testator in ignoring the claims of the three orphan girls, his grandchildren, who were wholly without means, and in bestowing a farm well worth from $16,000 to $18,000 upon his son, strongly corroborated the opinion of the witnesses that his will was the product of an unsound and unhealthy mind. We are of the opinion that there was evidence upon which to submit that issue to the jury and that under proper instructions it was their province to determine the fact. Of course, if the testator was otherwise found to have testamentary capacity, the inequalities of his will constituted no ground for setting it aside. If of sound mind he had a perfect right to discriminate in favor of his son and against his other children and grandchildren, and their poverty would not affect the case, and it was not the province of the jury to hold him incompetent because he did not dispose of his prop-

erty as they would have done, or as his disappointed children feel he should have distributed it. *McFadin v. Catron*, 120 Mo. 252; *Farmer v. Farmer*, 129 Mo. 530; *McFadin v. Catron*, 138 Mo. 197.

We are thus brought to the refusal of the instruction declaring there was no evidence of undue influence. Upon this point we think the learned circuit court erred. After a patient reading of the whole record we can not find the most remote evidence that W. P. Briggs ever endeavored to influence his father to make him his principal devisee. On the contrary the will seems to have been made in pursuance of a long cherished desire on the father's part to recompense the son for returning from California and taking upon himself the support of his feeble old father and afflicted mother. This was the father's proposition when he urged the son to return. Unless we are to say that the kindly offices of a son to his old and ofttimes helpless parents create a presumption of undue influence merely because the parent sees fit to reward the performance of such duties, then this record is barren of any testimony showing undue influence. We have often held otherwise. *Maddox v. Maddox*, 114 Mo. 35; *Berberet v. Berberet*, 131 Mo. 399; *McFadin v. Catron*, 138 Mo. 197.

It becomes unnecessary to further discuss the objections to the various other instructions given and refused on the question of undue influence. None of them should have been given. Several of them are glaringly incorrect, notably those imposing upon the son the burden of establishing that the will was voluntary and without the undue influence of the son and requiring him to account for the inequality in the legacies. The instructions given by the court of its own motion were sufficient and correct declarations save those on undue influence. In their stead the

court should have instructed there was no evidence to support that allegation in the petition.

III.    The question propounded to the defendant, inquiring if he did not think the provisions of the will unjust, was highly improper and should not have been permitted.

For the errors noted the judgment is reversed and the cause remanded.    SHERWOOD and BURGESS, JJ., concur.