ELMIRA TOWNSEND, ELLA F. BOLLES, CHARLOTTE L. WELLBORN, GEORGE SMITH, WILLIAM SMITH, LOIS SAUGIER, LUELLA REED, JOSEPH SAUGIER, RUBY PARSONS, AGNES PARSONS, LESTER PARSONS, RUTH S. PARSONS, PHILLIP A. PARSONS, I. N. WAGGONNER, LELIA WAGGONNER, WILLARD WAGGONNER, WANDA WAGGONNER, FREDERICKA WAGGONNER, MAGDALENE WAGGONNER PETERSON, DEFORREST E. CROW, FLORENCE DUNNINGTON; WENDOLA AUSMUS, DOROTHY M. CROW, GERALD M. CROW, WILFRED E. CROW, MAUD MAY CROW, DONALD W. CROW, ELIZABETH WAGGONNER, CLARA WAGGONNER CURREY, ISAAC RICHARD CAMPBELL, LOU LEAVITT, MARY HAZELTON, BLAKE HARRIS, JENNY MACY, JOSEPHINE BRENNAN, DORIS LAWRENCE, MAY LAWRENCE, BERT LAWRENCE, JOHN S. WHITE, MARTHA PETOSKE, CORA HANSEN, MARY LURANCY RICHARDS, FRED P. WHITE, GRACE P. MARTIN, FRED PARRIS, WILL PARRIS, GEORGE PARRIS, MARIE BRENNAN BLOMSTRAND, HENRY S. BOLLES and ADDISON WELLBORN, Appellants, v. BOATMEN'S NATIONAL BANK, Named and Appointed as Executor and Trustee Under the Alleged Last Will of HUGH W. THOMASSON, Deceased: ST. ANTHONY'S HOSPITAL, a Corporation; ST. LUKE'S HOSPITAL ASSOCIATION, a Corporation; THE LUTHERAN HOSPITAL, a Corporation; ST. LOUIS MUSEUM OF FINE ARTS, a Corporation; CHARLES A. LEE, Superintendent of Public Schools of the State of Missouri and President of the State Board of Education; GUY B. PARK, Governer of the State of Missouri; ROY MCKITTRICK, Attorney General of the State of Missouri; DWIGHT H. BROWN, Secretary of State of and for the State of Missouri, *Ex-Officio* Members of the STATE BOARD OF EDUCATION and THE STATE OF MISSOURI.—104 S. W. (2d) 657.

Division One, April 21, 1937.

552

Taylor R. Young, Stephen A. Boggiano and Patrick H. Cullen for appellants; Cullen, Fauntleroy & Edwards, Cullen Coil, Walter L. Metcalfe, Clem F. Storckman and Jules Q. Strong of counsel.

*Lehmann & Lehmann* and *Charles Claflin Allen, Jr.,* for The Boatmen's National Bank; *Roy McKittrick,* Attorney General, and *Edward C. Crow,* Special Counsel, for The State Board of Education and Members of said Board.

BRADLEY, C.—Action to contest the alleged will of Hugh W. Thomasson, deceased. The verdict sustained the will. Motion for new trial was overruled and contestants appealed.

Testator had no lineal descendants, and contestants are his collateral kin (on his mother's side), second and third cousins, except Henry S. Bolles and Addison Wellborn. These two were not related to testator, but were made parties plaintiff because they were named as beneficiaries under the will. The will was executed September 8, 1926, and testator died January 28, 1933. A woman known as Grace Carolyn Mahood, prior to her alleged marriage to testator, claimed to be his widow at the time of his death, but contestants allege that if she were ever his lawful wife, she had released to plaintiffs, Ella P. Bolles and Elmira Townsend as trustees for all the heirs and creditors of testator, whatever interest she had, and for that reason, was not made a party defendant.

Contestants allege that the purported will was presented to the probate court of the City of St. Louis, on or about October 24, 1933, by defendant, Boatmen's National Bank, trustee and executor under the will, and was duly probated. The will is set out in full in the petition. The opening paragraph of the will recites that the testator

was single, about which there was no question at that time. There are seven sections in the probated will. The first section directs the executor to pay funeral expenses and debts. Section 2 bequeaths paintings and other pieces of art and chinaware to the St. Louis Art Museum. Section 3 gives remainder of personal effects to plaintiff, Henry S. Bolles, if living at time of testator's death, and if not, then to plaintiff, Addison Wellborn. Section 4 bequeaths $2000 each to St. Anthony's Hospital, St. Luke's Hospital Association and The Lutheran Hospital. Section 5 (consisting of several paragraphs) devises the residue, real and personal, including money, stocks and bonds, to the Boatmen's National Bank in trust, and directs that the trustee shall not sell or dispose of any real estate or interest therein prior to the termination of the trust, but the trustee is directed to retain the real estate and rent or lease the same under such terms and conditions as in the judgment of the trustee will yield the best results. Also, the trustee is directed to repair, maintain, pay taxes, etc. Then out of the net income, the trustee is directed to pay, in semiannual installments, until the termination of the trust, the following: (a) $1000 per annum, to Lottie Wellborn; (b) $1000 per annum to Ella Barnes; (c) $1000 per annum to Virginia Walton; (d) $1000 per annum to Ella Bolles; (e) $600 per annum to Henry S. Bolles; (f) $300 per annum to Charles Level, a colored servant.

And then Section 5 directs that the remainder of the net income be distributed semiannually "unto the Treasurer of the State of Missouri, or unto such other officer or officers of the State of Missouri as may be authorized by law to accept and receive the same, to be and become a part of the public school moneys of the State of Missouri, to be used for the benefit of the free public schools of the State of Missouri, forever, and for no other purpose, in such manner as the legislature of the State of Missouri may provide, or as may otherwise be provided by law."

Section 5 further provides: "This trust shall cease and determine twenty (20) years from and after the date of my death, after which time, or within a reasonable time thereafter, the said trustee shall sell all of the above described property as soon as it can effect sales thereof at reasonable prices and upon favorable terms and conditions, without sacrificing any of the said property, and the entire net proceeds derived from any and all such sales shall be paid over and distributed together with all personal property free from trust unto the Treasurer of the State of Missouri," etc. The remainder of this paragraph is about the same as the language of the paragraph next above after the words "Treasurer of the State of Missouri," and then Section 5 continues in a separate paragraph:

"It is my intention, and I hereby direct that the trust hereinbefore created shall cease and determine twenty (20) years from and after

the date of my death, and that the payments of income as provided in paragraphs (a), (b), (c), (d), (e) and (f) hereof shall then cease, and that as soon thereafter as possible, the said trustee shall sell all of the above described real estate as hereinbefore provided; but until such sales are finally effected after the twenty (20) year period as hereinbefore provided, the surplus income arising from the trust estate shall be paid over unto the Treasurer of the State of Missouri for public school purposes as hereinbefore provided; said trust shall absolutely terminate twenty years after my death, but I request and desire that my trustee shall hold said property until a favorable sale in its opinion can be made thereafter, but in no event more than five years after the termination of the trust. My trustee's deed however, at any time after the termination of this trust, shall convey title to the purchaser.''

The remainder of the will and the last two sections are as follows: Section 6. ''I hereby direct my executor hereinafter named to pay all estate and inheritance taxes assessed against my estate or against the distributive shares of the beneficiaries hereunder out of the general assets of my estate and such taxes, when paid, shall not be charged against the distributive shares of the said beneficiaries.''

Section 7. ''I hereby nominate, constitute and appoint The Boatmen's National Bank of St. Louis, executor of this my last will and testament; and I hereby certify that at or before the execution of the same, I had advice and counsel in relation thereto, from someone not under salary from the said The Boatmen's National Bank of St. Louis.''

It is alleged that plaintiffs, Henry S. Bolles, Ella F. Bolles, Addison Wellborn, Charlotte Wellborn and the three hospitals ''have renounced any and all claims under the said will for the reason that said paper writing or will, if executed by the said Hugh W. Thomasson, during his lifetime, was executed at a time when the said Hugh W. Thomasson was and for many years had been a person of unsound mind and wholly incapable of managing his affairs.'' And it is alleged that legatee Charles Level predeceased the testator, and for that reason, the heirs of said legatee had no interest and were not made parties defendant. The contest is based solely on the alleged mental incapacity of the testator to make and execute a will and is pleaded as follows:

''Plaintiffs state that Hugh W. Thomasson was mentally feeble and immature from his youth up and never arrived at full mental development; that at the time it is claimed the paper writing alleged to be his will was executed, to-wit, on the 8th day of September, 1926, and long prior and subsequent thereto, the said Hugh W. Thomasson was a chronic imbecile, a person of unsound mind and incapable of managing his affairs and an insane person. That he did not have

the mental ability to comprehend and understand the ordinary affairs of life or to know or comprehend the value, condition, extent and nature of his property or to know or ascertain the number and names of the persons with whom he had been or was associated or to whom he was related and his mental capacity and memory was so deficient that he was unable to retain any or all of these facts in his mind long enough to prepare or to direct the preparation of a will, and he was so mentally deficient that he did not know the nature of the transaction in which he was engaged and the disposition he was making of his property and he was unable either with or without the aid of other persons to form a rational judgment regarding such matters and was wholly incapable of disposing of his property by will, and plaintiffs say that said paper writing is not the last will of the said Hugh W. Thomasson.''

Defendant, Boatmen's National Bank, answered by general denial and then alleged the presentation of the will to the probate court and its probate; its appointment as executor under the will and the issue of letters testamentary to it by the probate court. The State Board of Education, by its member defendants, the Governor, Attorney General, Superintendent of Public Schools and Secretary of State, answered by general denial and then alleged that at the time of making and executing the will the testator was of sound mind. The answer of the State Board of Education contains other averments not necessary to here set out.

Seven separate assignments are made, but these may be grouped as assigning (1) on the refusal of the peremptory request of contestants for a directed verdict at the close of the whole case; (2) on the giving of proponents' Instruction No. 2; (3) that proponents' Instruction No. 3 is in conflict with contestants' Instruction No. 1; and (4) on argument of counsel for proponents.

Hugh W. Thomasson, the testator, was born in St. Louis in 1857, and was the son of Tower and Emily White Thomasson. His mother was the only child of Captain Hugh L. White, a wealthy steamboat owner and operator, and who resided, until his death, in St. Louis. Captain White did not approve the marriage of his daughter and did but little for the couple. When testator was quite young, his father and mother moved to Calhoun, in Henry County, Missouri, and there engaged for a time in the milling business. The father became addicted to drink and finally abandoned the mother and son, and disappeared. Testator lived on with his mother, who was a cripple, unable to walk from the time of his birth. Captain White had other domestic troubles, and he and his wife, the grandmother of testator, were separated and divorced. When testator was quite a young man, his grandmother died in Illinois, and from her estate, he and his mother received enough money to buy a small farm in

Henry County, upon which farm they existed until the death of Captain White in 1891. Captain White died intestate and the mother of testator, Hugh W. Thomasson, inherited the large estate of her father. After the death of Captain White, testator and his mother moved to St. Louis, took charge of the extensive properties and occupied the White home at Grand and Delmar. The mother died in 1909, and testator inherited all of the Captain White properties. After the death of his mother, testator resided alone in the White home, until he sold it to the Knights of Pythias in 1926. After this sale, testator resided at the Fairmont Hotel in St. Louis until the claimed marriage to Grace Carolyn Mahood on the 25th day of July, 1930. His vicissitudes, from the day he met Grace until the day of his death, are, in part at least, current history within the zone of circulation of the St. Louis newspapers. Some of these experiences appear in the record, but it is not necessary to detail them. The chief question here is whether or not there was substantial evidence to support the verdict of the jury sustaining the will, and we now take up this question.

We shall first consider the evidence of proponents of the will. Proponents used numerous lay witnesses and six medical on the issue of mental capacity. First, proponents put on the subscribing witnesses, introduced the will, etc. Then followed the evidence of contestants. Then proponents used other witnesses. But we take up the evidence of proponents without reference to the order of presentation. Witnesses for proponents testified in substance as follows:

Richard A. Jones: That he was a witness to the will and was a lawyer; had practiced for twenty-five years; that he knew testator personally; "he was a person that I had from time to time known as one who was dealing in connection with that property there at Washington Avenue (southwest corner of Washington and Broadway, owned by testator) and he was normal enough to get the best of us (Frank Real Estate & Inv. Co.) every time we had anything to do with him."

Leighton Shields (by deposition): That he was a lawyer, practiced for twenty-nine years; that he was connected as counsel with the Reconstruction Finance Corporation, Washington; that on September 8, 1926, he was practicing in St. Louis; that he was one of the witnesses to the will; that he knew testator since 1908 or 1909; that in St. Louis he had resided near the home of the testator; that testator "lived the life of a hermit;" that he was careless in dress, his clothing rumpled, linen soiled and "his hair wasn't always kept neatly trimmed or brushed;" that from the contacts he had with testator he could not say whether he was "sluggish mentally or simply eccentric;" that he saw testator after 1926 and that he appeared

to be better dressed, but that his conversation and actions were about the same as back in 1910.

Isaac H. Orr: That he was a lawyer and in 1926, was president of the St. Louis Union Trust Company; that he knew testator, met him first in 1926; that he and George M. Pyle, an employee of the trust company, called on testator to discuss the subject of testator executing a will, naming the trust company as executor and trustee; that he had an extended conversation with testator; that on that occasion testator told him two things: that "one was that he (testator) wanted to use a substantial portion of his estate in—for the education of the children in the public schools;" that the other thing was "he told me that his attorney told him that the trust which Mr. Pyle had prepared . . . was not good or was against the law" (of perpetuities). (Pyle had theretofore talked with testator and had prepared the draft of a will.) Witness further stated that from his conversation with testator ·that he considered him of sound mind.

George M. Pyle, vice president of the St. Louis Union Trust Company: That in 1926, he was secretary of the trust company; that he saw testator in the first part of the year 1926, at testator's home; that he went out to talk to him about using the services of the trust company in connection with his will; that testator said that he had been thinking about making a will and would consider it further; that testator told him his (testator's) plan for distributing his estate; that he, witness, took a memorandum of how testator wanted to dispose of his property. "I told him I would make a memorandum of how the will was to be prepared, and I asked him certain questions; I asked him to tell me how he wanted to distribute his estate, and he told me; he mentioned certain specific bequests, certain gifts to certain individuals, as I recall, and he said he wanted to leave the rest of the estate, after the payment of those gifts, in trust with the trust company for the benefit of the rural school children. Q. Now, did you go and draft a will after that? A. I took the memorandum back to the trust company and arranged for one of my associates to draft it." In about two weeks, witness Pyle again called on testator about the will and then shortly thereafter saw him the third time. The three visits by Pyle were prior to the visit of Pyle and witness Orr. As to the third visit, Pyle testified that he took with him a draft of a will, read it to testator and left a copy with him, talked to him about the will; that testator talked; that the visit with Mr. Orr to see testator was about two weeks after his (Pyle's) third visit; that on the visit with Mr. Orr, he (Pyle), asked testator if he was ready to sign the will and that he said he was not. Pyle further testified that testator said that he had shown the will to his lawyer and that "the lawyer seemed to think that in some respects it was a violation of the law and the lawyer advised him not to sign it;" that the

will was redrafted and the trust period reduced to 20 years and that he (Pyle) saw testator again and that they talked about the revised will. "I told him that we had changed it in accordance with his suggestion and if it was all right in this form I would like for him to sign it, so he seemed to think that it still was not just the way he wanted it; he was not satisfied with the will, or that he didn't seem to be particularly interested in having the St. Louis Union Trust Company handle his estate at that time." . . . "Q. During all these various conversations, did you come to an opinion of whether he was a man of sound or unsound mind? A. I thought he was of sound mind."

Louis H. Wissman, real estate business: That he had known testator for thirty years, from 1903 to 1933; that testator came in the real estate office off and on through the years; that testator transacted business at the office; "made applications for loans on different occasions there;" that the loans were made at different periods, different years; that the loans were made on the property at Broadway and Washington and other property. Witness, Wissman, testified to an extensive experience and dealing with testator and said that testator was of sound mind "in my estimation always."

Miss Marie Louise Bender, a graduate nurse: That she knew testator from 1919 to 1926 and had many conversations with him; that her nursing experience, over many years, included a three months' period nursing insane people; that she was introduced to testator at a restaurant where she took her evening meal and where testator also had his meals; that after the introduction, "I always sat at his table or he sat at my table;" that at the first meeting she and testator "discussed current topics, things that occurred;" that this was probably in the fall of 1919; that during the period she and testator dined together he talked about many things; asked her about her family; where she was born; told her he lived alone; that his mother was dead; that they talked about schools and the education of children; that testator told her that "he hadn't had much education;" that one evening they had a newspaper which carried a news item about some rich person having endowed a school, and that testator said that "he thought that would be what he would do with his money if he had any when he died." She was asked about his table manners and said that they were proper. (Contestants' evidence was that his table manners were bad.) She said that testator spoke distinctly and in a low tone; that she never heard him mumble. (Contestants' evidence was that he did not talk at all, but just mumbled); that she thought "he was a little better than the ordinary man of his age."

Thomas Keeshan, Jr.: That he knew testator prior to the death of his (testator's) mother (1909); that he drove the carriage for testator and the mother; that he helped carry the mother out of the house when they went driving; that testator took his mother driving

twice a day; that he, witness, sold testator some real estate; that he had eaten with testator "a hundred times;" that his (testator's) table manners were good; that "he always used his knife and fork;" that testator was a good business man.

Walter Stahlhuth: That he was a lawyer and was probate judge of St. Louis County in 1932; that he belonged to the Knights of Pythias; that he met testator before the lodge purchased from him (testator) in 1926, the property at Grand and Delmar; that he met testator at a meeting of the directors of the Pythian organization; that at this meeting the purchase price of the property was discussed and that "an effort was made to try to get him (testator) to sell for a lesser price and he was obstinate; looked like he wouldn't do it; and then there was a question came up at that meeting—the discussion at that meeting about the price and also the probabilities of the widening of what was then called—of what was then called Morgan Street—I believe it is now called Delmar—and I remember distinctly Mr. Thomasson saying that the damages would—I mean the allowing of damages would probably offset the benefits." . . . "Q. How much—do you recall what the price was, as near as you can remember? A. It was over three hundred thousand dollars, but I don't recall the exact price. Q. Was there anything said to Mr. Thomasson by any of the directors there about that price? A. Yes. They tried to get him to sell for less money, but who said that to Mr. Thomasson, I don't recall. Q. What did he say? A. I can't give you his exact words, except that he would not do it; he would not come down on his price. Q. Did he talk at that time? A. Yes. Yes, I heard Mr. Thomasson talking."

William J. Johnston: Knew testator shortly after he and his mother came to St. Louis in 1891; saw him frequently from then until his alleged marriage (1930); then witness said he saw testator frequently up to 1925; that he did work for testator; that he never heard testator mumble; that he contacted testator for a contribution to the Y. M. C. A., which was endeavoring to raise three million dollars; that he explained the situation to him; that testator "listened very attentively" and said, "I will give you $1000;" that thereupon testator wrote his check for $1000; that this was in 1924; that he conveyed to testator some information concerning the sale of property owned by testator; that testator listened very attentively, asked some questions, and thanked witness for the information; that on one occasion, he invited testator to the home of witness on Christmas; that there were other guests, and that testator apparently enjoyed the occasion, was dressed in the ordinary way, and that he ate like anybody else.

Leo B. Painter: That he was a member of the Knights of Pythias committee that discussed the purchase with testator of the Grand

and Delmar property; that he first saw testator at his (testator's) house at Grand and Delmar, prior to the purchase; that another member of the board was present; that he and the other member talked with testator; that they could understand what he said and that he (testator) understood what they said; that he did not hear testator mumble on the occasion; that he talked like anybody else; that next time witness saw testator was at the meeting of the Pythian committee, which was held for the purpose of trying to come to an agreement with testator; that testator was dressed like the average man. Witness further testified that testator was a member of the Knights of Pythias and that he, witness, saw testator take one of the degrees of the lodge; "Q. You have an opinion whether he was of sound or unsound mind, don't you? A. Yes, sir. Q. Now, which was he? A. Well, it seems like he was sound."

E. L. Finkbein: That he, witness, was a member of the Knights of Pythias; that he met testator four or five times·in connection with the purchase of the property at Grand and Delmar; that he heard testator ·discuss the sale of the property and that testator answered questions that were asked him; that testator was dressed as an ordinary man would; that he never heard testator mumble; saw nothing about his face or appearance different from an ordinary man; "Q. As far as you could tell, was he of sound or unsound mind? A. Sound, as far as I could tell."

William C. Swartout: That he was assistant engineer for the Missouri Pacific in St. Louis; was a member of the Men's Class of the Third Baptist Church near testator's residence; saw testator at the class many times; that witness thought this was between 1920 and 1930 or 1931; that testator attended regularly; that he, witness, talked to testator and that testator talked to him and that witness thought testator understood, and that he, witness, understood what testator said; that testator's appearance was that of an average man; that he never heard him mumble. "Q. What was your opinion as to his mind, as to being sound or unsound from seeing him there in the club (men's class)? A. Well, not being a doctor, I am speaking from the layman's standpoint, I would say that his mind was sound."

Chas. L. Zander: That he was connected with the Standard Oil Company in a clerical capacity; that in 1924, he was selling real estate; that he came in contact with testator; that he saw testator on an average of about once a week from October, 1923, until April, 1924; that he, witness, and those with whom he worked, knew the district of Grand and Delmar, and were interested in closing a deal on a certain portion of that property; that such was their primary interest in testator; that witness discussed the matter with testator; that he, witness, knew the testator was the type of man who could not be pushed; that he was a backward sort of a gentleman; that he,

witness, brought the matter along slowly, meeting testator often, and that it took a period of six months to close the contract; that he, witness, "would talk to him for fifteen minutes to an hour at a time;" that testator was a conservative dresser, not stylish, but clean; "Q. Would you say he was a man of sound or unsound mind? A. My business dealings with him would lead me to believe he was of absolutely sound mind."

Otto F. Karbe: That he was a lawyer, practiced thirty years; that he met testator about twenty years prior to the trial of this cause; that he saw testator quite often over a period of several years; that testator dressed as the ordinary man, neat and clean; that he, witness, thought that he had tried to take care of one or two legal matters for testator "some six or seven years ago;" "Q. Well, would you consider him of sound mind or unsound mind? A. Oh, I consider him of sound mind."

George J. Tremayne: That he was engaged in the real estate business in St. Louis; had known testator for twenty years; that he had business dealings with him; that he understood what testator said and that testator understood what he said; that testator dressed neatly; that he was reticent; "Q. Is it your opinion he was a man of sound or unsound mind? A. Well, not being an alienist, I would take him to be a man of sound mind."

John E. Ritchey: That he was connected with the Prudential Life Insurance Company; was a member of the Men's Class of the Third Baptist Church, St. Louis; that he saw testator at the church and on the street; that he never heard testator mumble and that he was fairly dressed; "Q. Did you have any opinion as to whether he was a man of sound or unsound mind? A. Well, I never thought of him being unsound."

Edward E. Savage: That he was in the roofing business; knew testator from 1923 to 1925; that testator called him in 1923 to examine the roof of testator's building and that he, witness, talked to testator about the work to be done; that since that time he had seen testator about a dozen times; that he, witness, belonged to the Bible Class of the Third Baptist Church and saw testator there. "Q. Did he impress you as being a sane or insane man? A. Impressed me as being sane."

R. E. Laidley: That he was in the insurance business; had known testator for twenty-five years; that twenty-five years ago, he, witness, lived just east of Grand on Washington, about a block and a half from the home of testator; that he saw testator quite often; that he knew testator prior to the death of testator's mother; that he knew the mother and was at the house while she was living; that he had had conversations with testator, just general conversations; that testator was a man who did not talk much; that testator's appear-

ance was that of the average man; that he never heard him mumble; "Q. Well, would you think he was a man of sound or unsound mind? A. I would say he was a man of sound mind. That was my own impression."

Grover C. Sibley: That he was a lawyer; had practiced about twenty years; that he met testator two or three times in connection with the property at Grand and Delmar, which was purchased from testator by the Pythian Building Company; that witness was on the board of directors and a member of the executive committee; that the Pythian Building Company was a little behind, at the time of this meeting, with the payment of some of the notes; that the question arose as to figuring the interest, and especially as to the penalty that might be attached, because it was "provided he (testator), might figure it at eight per cent if they were behind;" that when testator came to the meeting that evening (in 1927 or 1928) he, testator, had two sheets of paper on which he had apparently set down quite a few figures to arrive at what the amount of interest should be; that testator sat at the table with the committee and did more figuring and arrived at a figure as to what we owed him, which figures were verified by the president of the Pythian Building Company; that he, witness, did not remember the exact figure, but it was a large sum of money; that the president of the board reminded testator that the Pythian lodge was a fraternal order and asked him to knock off some odd figures, which would reduce the amount about $100; that at first, testator demurred, and then did some more figuring and said, "All right."

W. E. Aydelotte: That he resided in Fresno, California; that he was in the engineering corps in France during the World War; that he got in touch with testator just after his return from France, when he, witness, went to San Antonio, Texas, to work for the firm of Willis & Thomasson (testator); that the firm of Willis & Thomasson was engaged in the oil lease business; that the firm had quite a suite of offices in San Antonio; that the business of witness was to look up field notes, make plats, etc.; that the firm was selling leases and were drilling a well near San Antonio; that the business of the firm went bad and it was dissolved, and Willis left, and wrote witness to stay on the job and take care of things, and that Thomasson would get in touch with him; that he, witness, first saw testator about two months after Willis left; that testator went down to San Antonio, to square up salaries, etc.; that the field notes had not been properly looked up; that the leases had not been platted and recorded in the ten counties around San Antonio, where the firm operated; that the witness had to go around to these counties and check up everything to be sure that there was no unfinished business which would come back on testator; that he, witness, went into all these details with the testator;

that testator discussed the matter with him and wrote him letters about the matter. (Between November 15, 1920, and August 2, 1922, testator wrote the witness Aydelotte many letters concerning the affairs of the firm of Willis & Thomasson, and twenty-seven of these letters are set out in the record, and photostatic copies of the originals in the handwriting of testator were filed here with the record.) All these letters, so far as sense, spelling, punctuation, etc., are about alike. We here set out one:

"Mr. Wm. E ayalotte                                        Dec 13-20

"Dear sir  Mr Jackson and sutter Were hear saturday to try and get some promises on the acreage sutter and the Kansas City people bought of corse  I did not make any promises or pay any money, now Mr Jackson claimes the land was not surveyed and wantes Me to have it all surveyed by County surveyor. I understand from your letter it mostly has been surveyed by the count surveror, see Terry & Terry about it yours Truly

Hugh W Thomasson"

Speaking of an occasion when he, Aydelotte, had a conversation with testator, witness testified that he talked with testator; that he understood what testator said; that they talked about the business and that testator talked intelligently; that he dined with testator two or three times; that testator was not well dressed, but neat enough; that testator was inclined to be saving; that when they dined together testator did the ordering and ordered a balanced meal. "Q. Well now, from your contacts with him, would you say he was a man of sound or unsound mind? A. I can say he was perfectly sane."

Ann Steward: That she was a waitress at the Park Plaza Hotel; that she had seen testator often in the Park Plaza Coffee Shop; that he ate breakfast there with a Mrs. Hough, who was about sixty-five years old; that she, witness, waited on them; that testator ate like anybody else; that he talked to Mrs. Hough; he told me what he wanted; that he drank his coffee out of the cup; (some of plaintiffs' witnesses testified that testator never used his coffee cup; that he drank his coffee out of the pot and sometimes out of the spout). "Q. What would you say, would you consider him a person of sound mind? A. I would."

Many other lay witnesses were used by the proponents of the will, all of whom related facts and circumstances in connection with the testator tending to show that he was of sound mind, when the will was executed. Among these was Edgar L. Taylor (who prepared the probated will) of the trust department of defendant, Boatmen's National Bank, at which bank testator had done his banking business since he and his mother went to St. Louis in 1891, and at which bank Captain White, grandfather of testator, did his banking

business. Many of these witnesses were asked the direct question as to their opinion of testator's mental capacity, and answered that in their opinion he was of sound mind. Also, proponents used six doctors, all of whom gave evidence tending to show that testator was of sound mind.

Contestants put on the stand about seventy-five witnesses, including eight doctors. The activities and conduct of the testator were revealed, we might say, from the cradle to the grave, and the evidence of contestants tended to show that testator was mentally incapable of doing anything of consequence, and that this condition existed from his childhood to the day of his death; that he lost considerable money on the various deals he made; that he could not carry on a conversation; that he mumbled to himself; merely grunted when spoken to. Also, contestants introduced some "writings" which their evidence tended to show were written by testator. There are several of these set out in the record. They are incoherent gibberings, and tend to support the contention of contestants that the testator was of unsound mind. Here is a sample:

"The Devil

"The Fly-by-Night Family. .

"Read the Bible on the contract-buster. Imps and liars reform and shun the devil of fine phasis or the hot spur that has to be shown, and ever so mild may be the worst, but never diets on dry bones and ever so small, but like the acorn grow. Some expect his majesty in the great beyond, a bull in the woods of the Phoenix, Arizona, kind, but have never reported a fine. Gotta begin at the foot of the class, boys, man is vile. Sine die.

"P. S. Your inheritance is not for sale till the buyer is on hand and you are starving, then get all you can. Conserve your resources and control your temper."

We do not deem it necessary to further set out the evidence. A will contest is an action at law and the weight of the evidence and credibility of the witnesses are questions for the jury. [Kaechelen v. Barringer (Mo.), 19 S. W. (2d) l. c. 1035; Knapp v. Trust Co., 199 Mo. 640, 98 S. W. 70; Charles v. Charles, 313 Mo. 256, 281 S. W. 417; Turner v. Anderson, 260 Mo. 1, 168 S. W. 943; Heinbach v. Heinbach, 262 Mo. 69, 170 S. W. 1143.] It is contended by able counsel for contestants that there is no substantial evidence in the record to support the verdict of the jury, and that the peremptory request of contestants at the close of the whole case should have been given. The demurrer to the evidence of proponents should be and is considered under the same rule as obtains in other kinds of case. The verdict sustained the will, therefore the demurrer admits as true every fact, circumstance and reasonable inference tending to establish the validity of the will. Also, in considering the demurrer, all the evidence of

contestants tending to establish facts, contrary to the verdict, is disregarded. Such a demurrer can be sustained only when the facts in evidence and the legitimate inferences therefrom are so strongly against the verdict as to leave no room for reasonable minds to differ. That these are the tests common to all law cases for ruling a demurrer to the evidence will be conceded. [See Young v. Wheelock, 333 Mo. 992, 64 S. W. (2d) 950, 1. c. 954; Stauffer v. Railway Co., 243 Mo. 305, 1. c. 316, 147 S. W. 1032; Goucan v. Cement Co., 317 Mo. 919; 1. c. 929, 298 S. W. 789; Morris v. Cement Co., 323 Mo. 307, 19 S. W. (2d) 865, 1. c. 872; Cech v. Chemical Co., 323 Mo. 601, 20 S. W. (2d) 509, 1. c. 511; Clark v. Atchison & Eastern Bridge Co., 324 Mo. 544, 24 S. W. (2d) 143, 1. c. 151.] ██ Manifestly no court could, under this record and the rule for considering a demurrer to the evidence, hold that there was no substantial evidence to support the verdict on the issue of mental capacity. We therefore rule that the peremptory request of contestants at the close of the whole case was properly refused so far as concerns the mental capacity of testator to execute the will.

██ It is contended that the will signed by testator and probated was a "different document from the one he directed the Boatmen's Bank to put in type," and that the will probated was the result of substitution, mistake, misrepresentation or fraud. Contestants did not plead fraud, but invoke this last-mentioned contention under their demurrer to the evidence. The probated will was put in final form by Edgar L. Taylor, of the trust department of the Boatmen's National Bank, and above referred to in stating the evidence of proponents. Taylor said he thought that the testator brought to him and that he had before him, when the probated will was placed in final form, the second Pyle draft hereinafter mentioned. Two drafts of a will were prepared by Pyle, naming the St. Louis Union Trust Company as executor and trustee. The two Pyle drafts and the probated will are similar in some respects, identical in others and then, in some respects, different. In all three, the two drafts and the probated will, the State school fund is provided for. The opening paragraph and Sections 1, 2, 3 and 4 of the Pyle second draft are identical with the probated will, but the second Pyle draft, in Section 5, after directing payment of debts, funeral expenses and the bequests to the three hospitals, gave the residue of the personal estate (except personal effects), including money, stocks and bonds, to Henry Bolles, if living at testator's death, and if not, then to Addison Wellborn, "husband of my cousin Lottie Wellborn." Section 6 of the Pyle second draft devises the residue "consisting entirely of real estate" to the St. Louis Union Trust Company in trust, and the trustee is given certain powers and duties, among which are: To lease, collect rents, pay taxes, repair, etc., all of which payments were to be paid from the income de-

rived from the trust estate. Out of the balance of such income the trustee was to pay, in semiannual installments, "until the termination of this trust . . . or until the dates of their prior deaths;" (a) $1000 per annum to Lottie Wellborn; (b) $1000 per annum to Ella Barnes; (c) $1000 per annum to Virginia Walton; (d) $300 per annum to Charles Level. Subdivision (e) of Section 6 (Pyle second draft) directs that "all of the rest, residue and remainder of such net income shall be paid over and distributed semiannually unto the Treasurer of the State of Missouri, or unto such other officer or officers of the State of Missouri as may be authorized by law to accept and receive the same, to be and become a part of the public school moneys of the State of Missouri, to be used for the benefit of the free public schools of the State of Missouri forever, and for no other purpose, in such manner as the Legislature of the State of Missouri may provide, or as may otherwise be provided by law." Subdivision (e) further provides: "It is my intention and I hereby direct that the trust hereinbefore created shall cease and determine twenty (20) years from and after the date of my death, and that the payments of income as provided in paragraphs (a), (b), (c) and (d) hereof shall then cease, and that as soon thereafter as possible, the said trustee shall sell all of the above described real estate as hereinbefore provided but until such sales are finally effected after the twenty (20) year period as hereinbefore provided, the surplus income arising from the trust estate shall be paid over unto the Treasurer of the State of Missouri for public school purposes as hereinbefore provided; but in no event shall this trust be continued after the twenty (20) year period for the purpose of effecting the sale of all of the said real estate for a period of time longer than twenty-one (21) years from and after the date of the death of the last survivor of the said Lottie Wellborn, Ella Barnes and Virginia Walton, or such of them as may be living at the date of my death."

Section 7 of the Pyle second draft is the same as Section 6 of the probated will and Section 8 of the draft is the same as Section 7 of the probated will, except as to the trustee and executor. Whatever draft of will that was delivered to testator by Mr. Pyle was taken by the testator to Mr. Taylor of the Boatmen's Bank. We have set out at some length the contents of the Pyle second draft, because Taylor testified that he thought it was this draft that testator brought to him when the probated will was prepared, and that he followed his draft, making such changes as directed by the testator. Contestants state in their brief that their theory is: (1) That testator never "wrote either will" (the probated will or either of the Pyle drafts); (2) that testator never knew what the probated will contained; (3) that the testator directed the Boatmen's Bank (Taylor) to make changes in the Pyle draft, but that the probated will does not conform

to testator's directions, but differs "in most material respects," and that the final draft, the probated will, "is an entirely different instrument" from the Pyle draft; (4) that the probated will was never read to testator or by him and that if he signed it, his act in doing so was the result of mistake, misrepresentation and fraud; and (5) that a different instrument was signed by him than the one he intended to sign, and that on account of the substitution of one paper for another, the signature never became binding. It will be noted that, in the second Pyle draft, the *personal property*, except personal effects, is left to Henry Bolles, while in the probated will the personal property goes to the residuary estate, and the *personal effects* to Bolles. And it is contended that Mr. Taylor was not instructed by the testator to make this change. Taylor, however, testified that the probated will was "the result of the changes that Mr. Thomasson made in the draft that he presented to me." Taylor, as a witness for proponents, testified that the testator, "in the summer" of 1926, came to the Boatmen's Bank and said, "I see you have a new department." (The bank had recently been authorized to act as executors, etc., and had put up a notice so stating); that he, witness said, "Yes, we can act as administrators and executors under wills;" that testator said, "That's fine;" that testator then walked out; that some time later testator brought in a draft of a will (Pyle second draft, as Taylor remembered) and said that he wanted to make some changes "in this will." (The draft had not been executed); that testator wanted to make two principal changes; "I want your bank to act as executor and trustee under a will, and I want to shorten the time that the trust estate has to run, and there are several minor changes that I want to make." Taylor testified that he (Taylor) then said, "Well, I will read this and as I come to the places you want changed, you tell me;" that he began to read the draft to testator. Objections were here made, after which witness testified: "There are three or four clauses there, the first three or four sections in the probated will are exactly like the sections in the will he brought in to be changed; getting down to the part where he wanted to give his property, give the residue of the estate in trust for the benefit of the public school fund of Missouri, he said, 'Stop.' I said, 'Do you want to change that?' He said, 'No,' he said, 'I want it to go that way, but I want to change the time that that trust has to run.' . . . I made a memorandum of the changes that he wanted made in the will, and told him—I said, 'We will have this drafted and I will send it over to Lehmann & Lehmann's (attorneys for the bank) office and ask him if it is legal, and you come back in a few days and I will give you the new draft, and I will give you back the one you gave me.' " Witness stated that shortly thereafter testator came back to the bank, got the new will and the Pyle draft and said, "I am going to take it to my lawyer and see if

he thinks it is all right." The will was executed in the office of Stephen C. Rogers, who had been attorney for testator since 1916 or 1918. Rogers testified he looked over the will to see that it was in legal form, but did not discuss its provisions with the testator. The subscribing witnesses did not read the will or hear it read. Testator, according to a receipt, brought the executed will back to the Boatmen's Bank on September 8, 1926, the day it was executed. The will, according to the receipt, was to be deposited in the vaults of the bank and to be cared for and delivered during the lifetime of testator to him only, or on his written order and at his death, "to be duly offered for probate." The will remained in the bank, from the date of its deposit, until August 2, 1932, at which time testator gave a written order to deliver it to Randolph Laughlin, testator's attorney in a suit then pending against testator. It is recited in this order that the will was "needed at once" in that pending suit and then on trial.

As above stated, testator died January 28, 1933, and the will was returned to the Boatmen's Bank by Mrs. Randolph Laughlin (Mr. Laughlin was then dead) October 7, 1933.

There is no support in the record for the contention that the court should have given contestants' request for a directed verdict against the will, on the theory that Taylor prepared a will contrary to the directions of the testator or that testator did not know the contents of the will. In Instruction No. 1 given at the request of contestants the jury was told that they could not find for the will unless they found, among other things, and by the greater weight of the evidence, that testator "realized to whom he was giving" his property, "without the aid of any other person." We have ruled, supra, that there was substantial evidence tending to show that at the time of the execution of the will testator was of sufficient mental capacity to execute it. That testator signed the will is not disputed. Neither is it disputed that he deposited the original in the Boatmen's Bank. Mentally capable and having signed the will, the presumption is that he knew its contents. We are clear that the peremptory request of contestants for a directed verdict against the will was properly refused.

Contestants assign error on Instruction No. 2 given at the request of proponents. This instruction told the jury that "a party has the right to dispose of his property by will as he chooses, even to the entire exclusion of those who, but for the will, would be heirs of his estate; and the jury are not to consider whether the disposition made by the testator is appropriate or unappropriate, but simply whether the paper propounded as his will be or be not his last will and testament." It is contended that this instruction "minimizes and excludes evidence material on the issue of mental capacity." As supporting this contention contestants cite: Muller v. St. Louis Hospital Assn., 5

Mo. App. 390; Lane .v. St. Denis Catholic Church of Benton (Mo. App.), 274 S. W. 1103; Everly v. Everly, 297 Mo. 196, 249 S. W. 88; Hartman v. Hartman, 314 Mo. 305, 284 S. W. 488; Aylward v. Briggs, 145 Mo. 604, 1. c. 612, 47 S. W. 510; Hughes 'v. Rader, 183 Mo. 630, 1. c. 710, 82 S. W. 32; Heflin v. Fullington (Mo. Sup.), 37 S. W. (2d) 931; Erickson v. Lundgren (Mo. Sup.), 37 S. W. (2d) 629; Hamner v. Edmonds, 327 Mo. 281, 36 S. W. (2d) 929; Schultz v. Schultz, 316 Mo. 728, 293 S. W. 105; Andrews v. Linebaugh, 260 Mo. 623, 169 S. W. 135; Wiegmann v. Wiegmann (Mo. App.), 261 S. W. 758; Kaechelen v. Barringer (Mo. Sup.), 19 S. W. (2d) 1033; Gay v. Gillilan, 92 Mo. 250, 5 S. W. 7; Mowry v. Norman, 223 Mo. 463, 122 S. W. 724; Bensberg v. Washington University, 251 Mo. 641, 1. c. 654, 158 S. W. 330; 28 R. C. L., sec. 40, p. 90, and sec. 103, p. 148; 68 C. J., sec. 64, pp. 458-459; Chaney v. Baker (Ill.), 136 N. E. 804; Huebel v. Baldwin (R. I.), 119 Atl. 639; 28 Am. & Eng. Enc. of Law (2 Ed.), p. 106; Hawkinson v. Oatway (Wis.), 126 N. W. 683; Eastis v. Montgomery (Ala.), 9 So. 311; 13 Ann. Cas. (note) 1044.

We shall not comment on or analyze all these cases. Some are entirely beside the point. In Everly v. Everly, supra, the son by the first marriage of the testator, contested the will, which in effect, disinherited this son. The testator entertained the notion that he was not the father of contestant. There was evidence tending to show that this notion was a mere insane delusion without fact support. On the other hand, there was evidence to the contrary. The verdict was in support of the will and the son appealed. On behalf of the proponents the court gave this instruction: "James M. Everly (the testator), if of sound mind as defined in these instructions, had the right to dispose of his property by will as he chose; this is the lawful right of every person possessed of sufficient mental capacity to make a valid will, even to the exclusion of those who, but for the will, would have been heirs to his estate; so it makes no difference what disposition he made of his property, whether appropriate or not, or whether in your opinion just. You have only to consider whether the paper writing produced as his will, be, or be not his will." It was held, under the facts there, that the harsh and unnatural disposition of the property by the will was material on the issue of mental capacity and was a circumstance which tended to discredit mental capacity, and in effect, it was held that the instruction prevented the jury from considering the unnatural disposition on the issue of mental capacity. The instruction was ruled erroneous and that the error was not cured by an instruction on behalf of the contesting son that the jury might consider "the will itself and all its provisions." Of the instruction invoked to cure, the court said: "That general statement (that the jury might consider the will itself and all its provisions)

allows the jury to do what they naturally would do without an instruction. It does not correct the specific direction that it made no difference what was the disposition of the property. The jury were allowed to consider all the will, *but were admonished that they were not to consider that feature of it.*" (Italics ours.)

In Schultz v. Schultz, supra (en banc), a will contest, on the ground of undue influence and mental incapacity, the court, at the request of proponents, gave three separate instructions, which together, were in effect similar to the direction of the instruction in the Everly case. In the Schultz case, the complaint made against the three instructions mentioned was that "they prevented the jury from considering the provisions of the will in passing upon the question of the testator's mental capacity." In that case the court gave, at the request of contestants, an instruction which cured as to the three instructions. In the present case the court gave, at the request of contestants, an instruction (No. 1) which told the jury that "the issue submitted to you for your decision is whether or not Hugh W. Thomasson was of sufficient soundness of mind to make a will on the 8th day of September, 1926, and in this connection you are instructed that before you can find in favor of the proposed will" it must be found from the greater weight of the evidence that at the time of signing the will testator had sufficient understanding to comprehend the nature of the transaction he was engaged in, "and was capable of understanding the nature and extent of his property, and the reasonable claim, if any, of all persons who may have been naturally and reasonably within the range of his bounty and to whom he desired to give his property and realized to whom he was giving it, without the aid of any other person," and that unless it was so found by the greater weight of the evidence that testator "did possess all these requisites," the finding would be against the will.

In the first place the will in the present case is not so unnatural as in the Everly case. In that case, if the obsession of the testator was without fact support (which was a question for the jury) then the will was unnatural in the extreme, because the son was, in effect, disinherited, while here relative contestants are related only collaterally and in a remote degree, and there is no such unnatural feature of the will as was involved in the Everly case.

"Evidence of unnatural provisions of a will is not sufficient in itself to establish either undue influence or mental incapacity. The law recognizes that a person of requisite age, free from undue influence and of sound mind, may, if he so desires, execute an unnatural will, disinherit his own kin, and bequeath his property to an entire stranger; but, where there is other substantial evidence of testamentary incapacity or undue influence, the unnatural provisions of the will, if any, may be considered, together with the other facts and

circumstances tending to show such incapacity or undue influence." Kaechelen v. Barringer, supra (19 S. W. (2d) l. c. 1037). In the Kaechelen case the testator devised a rather large estate to a stranger in the blood to the exclusion of most of his kin, all collateral. The contest was based on mental incapacity and undue influence. The verdict upheld the will. The court, for proponents, gave an instruction (similar to Instruction No. 2 in the present case) upon which instruction error was assigned. In that case there was an instruction for contestants directing that in determining whether the testator had sufficient mental capacity to make the will the jury "might consider the will and all its provisions." It was held that when all the instructions were read together, there was no ground for complaint. In the present case there was not such specific direction to the jury that in determining the issue on mental capacity they might consider the will itself as was in the Schultz and Kaechelen cases. Yet, as appears above, the jury was directed at the request of contestants what must be found before the will could be upheld. In view of the wide distinction between the alleged unnatural feature of the will in the Everly case and the present case, and also in view of the direction of the trial court in the present case, at the request of contestants, as to what must be found before the will could be upheld, we decline to rule that proponents' Instruction No. 2 constitutes reversible error. We have a statute in this State, which prohibits the upsetting of verdicts for procedural error "which shall not affect the substantial rights of the adverse party." [Sec. 821, R. S. 1929, Mo. Stat. Ann., sec. 821, p. 1090. See also, Sec. 1062, R. S. 1929, Mo. Stat. Ann., sec. 1062, p. 1352.] The last section mentioned directs that we "shall not reverse the judgment of any court" unless "we shall believe that error was committed . . . affecting the merits of the action." Under this record we have no such belief as to Instruction No. 2. The will was formally introduced and read to the jury and again and again throughout this extensive record of over 2,000 pages, it appears that the will, or some of its provisions, was called to the attention of the jury, and it is inconceivable, considering all the instructions together, that contestants were materially prejudiced by Instruction No. 2.

It is contended that proponents' Instruction No. 3 is in conflict with Instruction No. 1 for contestants. We have set out, supra, the substance of contestants' Instruction No. 1. By proponents' Instruction No. 3 the jury was told that the verdict would be for the will, if it was found (1) that at the time of making the will testator knew and understood that he was executing his will; (2) knew and understood at the time the nature and extent of his property; and (3) knew the natural objects of his bounty. It is contended that proponents' Instruction No. 3 is incomplete in that "the jury was

not, by said instruction, required to find that decedent had capacity to know and did know the contents of the will, or that he had knowledge of the claims of those connected with him by ties of blood.' The jury was not required to find that testator had capacity to know and did know to whom he desired to give his property, nor were the jurors required to find that he realized or knew to whom he was giving his property.'' And that because of all these omissions Instruction No. 3 was in conflict with contestants' Instruction No. 1. If testator knew all the matters and things set out in proponents' Instruction No. 3 (and the jury so found), then he had the requisite mental capacity to execute the will. [Pulitzer v. Chapman (en banc) 337 Mo. 298, 85 S. W. (2d) 400; Williams v. Lack, 328 Mo. 32, 40 S. W. (2d) 670; Sanford v. Holland, 276 Mo. 457, 207 S. W. 818; Meyers v. Drake, 324 Mo. 612, 24 S. W. (2d) 116; Berkemeier v. Reller, 317 Mo. 614, 296 S. W. 739; Knapp v. St. Louis Trust Co., 199 Mo. 640, 98 S. W. 70; Riggin v. Westminster College, 160 Mo. 570, 61 S. W. 803.]

A question similar to the one here is considered at some length in the Chapman case, supra, but there is nothing in that case that would justify overturning the verdict in the present case. In that case an instruction for contestant told the jury, without qualification (85 S. W. (2d) l. c. 416), ''that a testator must have mind and memory enough to understand without the aid of others the value, nature and extent of his property, and to retain all these facts in mind long enough to prepare his will.'' Of this the court said: ''A testator is not required to have mental command of the detailed facts concerning his affairs—if it were so, but few men of large estates and diversified interests could measure up to the standard. Further, the instruction enumerates particularly that a testator must be similarly able to understand the number and names of the persons who are the natural objects of his bounty, their deserts with reference to their conduct and treatment of him, their capacity and necessities. It has been said in one case, at least, that such requirements, put in an instruction, have a tendency to lead a jury to believe it is their province to say whether the testator made what they conceive to be a proper disposition of his property.''

We do not believe, and so rule, that there is any merit in the assignment of contestants based on the alleged conflict. If proponents' Instruction No. 3 required a finding of all that is required by the law, then contestants have no just ground for complaint.

Complaint is made on the argument of counsel for proponents. This argument is set out in full in the record and from the record it appears that no objection was made to any part of the argument, except in one instance. During the argument of General Crow for proponents, he said: ''What have you got? You have got here a will contest, against the bringing of which there is such a protest all

578

over this country it becomes a sort of popular racket. Mr. Cullen: I object to that statement as a reflection on the court and a reflection on the administration of the law. General Crow: No reflection at all. Mr. Cullen: To break the will of insane people has become a racket? I submit the court should rebuke counsel for it. The Court: I will sustain the objection to that. Mr. Cullen: Why, sure." The objection was sustained and nothing further was requested. In this situation there is nothing to complain about.

The judgment should be affirmed and it is so ordered. *Ferguson* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by Bradley, C., is adopted as the opinion of the court. All the judges concur.