ELLA BOLLES ET AL., Respondents, v. THE BOATMEN'S NATIONAL BANK OF ST. LOUIS ET AL., Defendants-Appellants and

THE BOATMEN'S NATIONAL BANK OF ST. LOUIS, Executor and Trustee, Appellant, v. OLLIN DRENNAN ET AL., Defendants-Appellants, No. 42915—255 S. W. (2d) 725.

Division One, February 9, 1953.

Motions for Rehearing or to Transfer to Banc or to Modify Opinion and Opinion Modified on Court's Own Motion, March 9, 1953.

950

*Chas. Claflin Allen* for appellant The Boatmen's Natl. Bank of St. Louis; *Lehmann & Allen* of counsel.

*Franklin E. Reagan* pro se.

*Boggiano & Hessel, Stephen A. Boggiano* and *Meyer Hessel* for respondents Ella Bolles and Henry S. Bolles, *Edward V. Long, F. D.*

*Wilkins* and *John F. Evans* for respondent Charlotte Louise Welborn, *John C. Casey* for respondent Virginia Barnes, *Lee, Fricke & Lee* and *Frank Lee* for respondent Ella Walter.

*Goodbar & Ferriss* and *Francis A. Casserly* for respondent St. Luke's Episcopal-Presbyterian Hospital, *Rassieur, Long & Yawitz* and *Milton Yawitz* for respondent Franciscan Sisters, and *George Eigel* for respondent Lutheran Hospital.

*J. E. Taylor*, Attorney General, and *Gilbert Lamb*, Assistant Attorney General, for Ollin Drennan et al., State Board of Education, M. E. Morris, State Treasurer, and G. H. Bates, Director of Revenue.

LOZIER, C.—Two cases were consolidated below. Both involved construction of the will of Hugh W. Thomasson.[1] One case involved requests for instructions by the Boatmen's National Bank of St. Louis as executor of Thomasson's estate and as trustee of his testamentary trust. Both cases involved questions relating to the payment, and the time and source of payment, of "annuities" under the testamentary trust; also various attorneys' fees. Other parties (herein collectively called the State—they represent the State of Missouri, an annuitant and the residuary beneficiary of the trust) are the State Treasurer, the State Director of Revenue and the eight members of the State Board of Education. Three of the parties (herein called the hospitals) are legatees under the will. Five of the parties (herein called the individual annuitants) are annuitants of the trust. Other parties, the unknown heirs of Charles Level, a sixth annuitant, defaulted. Defendant Franklin E. Reagan claimed certain attorney's fees. The bank, the State and Mr. Reagan appealed from the trial court's decree hereinafter summarized.

Thomasson died January 28, 1933. His will was sustained. (See Townsend v. Boatmen's Nat. Bank of St. Louis, 340 Mo. 550, 104 S. W. 2d 657.) Section 1 of the will directed the executor "to pay all of my just debts and funeral expenses as soon as practicable after my death, without an allowance or order of the probate court." Section 2 bequeathed paintings and other works of art to the St. Louis Art Museum. Section 3 bequeathed personal effects to one of the instant individual annuitants. Section 4 bequeathed $2000 to each of the three hospitals.

Section 5 devised and bequeathed "all the rest, residue and remainder of my estate, real and personal property, including money, stocks, bonds, securities and credits, and except personal effects,

---

(1) Apparently, our instant decision is the twentieth appellate court opinion involving either Thomasson's estate or his own unfortunate experiences. See Laughlin v. Boatmen's Nat. Bank of St. Louis, (Mo.) 163 S. W. 2d 761, 763, wherein we listed eleven earlier opinions. See also: Barnes v. Boatmen's Nat. Bank of St. Louis, 348 Mo. 1032, 156 S. W. 2d 597; In Re Thomasson's Estate, 350 Mo. 1157, 171 S. W. 2d 553; Boatmen's Nat. Bank of St. Louis v. Rogers, 352 Mo. 763, 179 S. W. 2d 102; Laughlin v. Boatmen's Nat. Bank of St. Louis, 354 Mo. 467, 189 S. W. 2d 974; In Re Thomasson's Estate, (Mo.) 192 S. W. 2d 867; In Re Thomasson's Estate, 355 Mo. 274, 196 S. W. 2d 155; Boatmen's Nat. Bank of St. Louis v. Bolles, 356 Mo. 489, 202 S. W. 2d 53.

belonging to me [728] at the time of my death," to the bank as trustee. "My said Trustee shall not sell or dispose of any real estate, nor any interest therein, until after the termination of the trust as hereinafter provided, but it shall retain all of such Real Estate in the trust estate." The trustee was authorized: To collect the rents and income from all property, both real and personal, and to pay taxes, insurance premiums, repair bills, other maintenance expenses and costs of alterations and improvements "out of the income arising from the trust estate"; to sell stock and securities "as it may deem and appear to be advisable and desirable"; and to rent or lease real estate, even for terms extending beyond the life of the trust, "upon such terms and conditions as in its judgment will yield the best results."

"Out of the balance of such net income the following payments shall be made unto the following named beneficiaries, until the termination of this trust hereinafter provided or until the dates of their prior deaths": $1000 a year to each of four of the instant individual annuitants and $600 a year to the other instant individual annuitant, all payable "in semiannual installments." (Charles Level, another named annuitant, died before the first semiannual installment became payable.) "All of the rest, residue and remainder of such net income shall be paid over and distributed semiannually" to the State Treasurer for public school purposes.

The trust was to "cease and determine" and "absolutely terminate" twenty years after Thomasson's death. Upon such termination, payments to the then living individual annuitants were to cease and, until the real properties were sold, "the surplus income arising from the trust estate" was to be paid to the State Treasurer for public school purposes. Upon such termination, "or within a reasonable time thereafter," the trustee was to sell the real properties "as soon as it can effect sales thereof at reasonable prices and upon favorable terms and conditions, without sacrificing any of said property * * * but I request and desire that my trustee shall hold said property until a favorable sale in its opinion can be made thereafter but in no event more than five years after the termination of the trust." The State Treasurer was to receive the proceeds of all such sales, "together with all personal property, free from trust" for public school purposes.

Section 6 directed the executor to pay "all estate and inheritance taxes assessed against my estate or against the distributive shares of the beneficiaries hereunder out of the general assets of my estate and such taxes when paid shall not be charged against the distributive shares of the said beneficiaries." Section 7 appointed the bank executor.

The State asserts that three of the instant individual annuitants are estopped to claim any interest under the will. This contention is based upon the fact that such annuitants, as plaintiffs-contestants in the will contest case, had alleged in their petition that they had

"renounced any and all claims under the said will for the reason that said paper writing * * *" if executed by Thomasson during his lifetime, was executed at a' time when he "was of unsound mind and wholly incapable of managing his affairs." Conceding that a beneficiary-contestant may take under a sustained will, the State argues that these three annuitants are nonetheless estopped from taking a position in the instant case inconsistent with that taken by them in the will contest case. The State cites 19 Am. Jur., Estoppel, Sec. 72, p. 704, 57 Am. Jur., Wills, Sec. 1562, p. 1067. However, those sections are not applicable in the instant circumstances because: These annuitants did not prevail in the will contest; the issues in that action were not the same as the instant issues; the State has not been misled or changed its position to its injury. See 19 Am. Jur., Estoppel, Sec. 73, pp. 709-710; 31 C.J.S., Estoppel, Sec. 7, p. 194; State ex rel. Ben Hur Life Assn. v. Shain, 342 Mo. 928, 119 S. W. 2d 236, 238-239; Wilkinson v. Lieberman, 327 Mo. 420, 37 S. W. 2d 533, 536.; Kirk v. Metropolitan Life Ins. Co., 225 Mo. App. 756, 38 S. W. 2d 519, 522.

The express provisions and unambiguous language of this will clearly show Thomasson's intent. He directed his executor [729] pay his debts; and to pay the estate and inheritance taxes "out of the general assets of my estate." Unquestionably, he intended and believed that his executor would and could pay, out of the personal property, the hospitals' legacies, the estate and inheritance taxes, all claims against the probate estate and the costs of administering that estate. Note that he specifically devised and bequeathed to his trustee, not only all of his real property but the residue of his personal property "including money, stocks, bonds, securities and credits * * * *belonging to me at the time of my death*"; that he authorized the trustee to sell "any stock or securities *I may hold* * * * as it may deem and appear to be advisable and desirable."

Equally clear are the will's provisions as to the trust, its terms, its assets, the trustee and its powers and duties. The trust corpus was the real properties and the residue of the personal estate. Sale of the real properties was prohibited for twenty years; meantime, the trustee was vested with full management powers, including those of leasing (but not of encumbering for any purpose), repairing and maintaining. Provision was made for the distribution, semiannually, of the trust's net annual income for each of the twenty years, and thereafter (but not necessarily semiannually) until the properties were sold. After such sales, the trust corpus itself was to go to the State.

Nor is there any uncertainty as to either the identities of the trust beneficiaries or as to the nature of their respective interests. "Testator's intention is the guide for the construction of testamentary trust estates." Garrison v. Garrison, 354 Mo. 62, 188 S. W. 2d 644, 648

[4, 5]. The interest of each individual annuitant was for life or twenty years. (By "annuitant" we mean a trust beneficiary entitled to annual payments. 3 C. J. S., Annuities, Sec. 1, p. 1374.) The will expressly provided for the payment, out of net annual income, of an annuity to each individual annuitant and of the balance to the annuitant State each year for twenty years; and the trust corpus was to be kept intact and pass to the residuary beneficiary, the State. Note again these provisions: "My said trustee shall not sell or dispose of any Real Estate, nor any interest therein, until after the termination of this trust as hereinafter provided, but *it shall retain all of such Real Estate* in the trust estate"; that upon the trust's termination, "the said Trustees shall sell *all of the above described property*" and deliver the proceeds of such sales to the residuary beneficiary, the State. And note also that the trust income was the *"rents and income from all property,* real and personal, *constituting the trust estate";* that operation, repair, alteration and maintenance costs were to be paid *"out of the income arising from the trust estate";* that the payments to the individual annuitants were to be made *"out of the balance of such net income"* and that "all of the rest, residue and remainder of *such net income* shall be paid over" to the annuitant State. These provisions clearly show Thomasson's intent that the semiannual payments to both the individual annuitants and the annuitant State were to be paid only "out of income arising from the trust estate." Contrast Cockrell v. First Nat. Bank of Kansas City, 357 Mo. 894, 211 S. W. 2d 475, 476, wherein the testator directed his trustee to pay a beneficiary a stated sum monthly, "out of the net income * * * of the Trust Estate." Contrast the trust instrument in Flarsheim v. United States, (C.C.A.8th) 156 F. 2d 105, 106, wherein any deficiency in an annuity, payable "out of the net earnings" of a business in any one year was expressly made payable out of net income of any subsequent year. Contrast McMillan v. Barnard Free Skin & Cancer Hospital, 304 Mo. 635, 264 S. W. 410, 414[8], wherein the testator expressly provided that a deficiency in an annuity, payable "out of the income from said trust estate," should be paid out of income for subsequent years. Contrast also the provisions of the will in Wiegand v. Woerner, 155 Mo. App. 227, 134 S. W. 596, wherein deficiencies in an annuity, payable "out of the net profits," were to be "made up" out of capital.

The interests of the trustee and the trust beneficiaries, respectively, vested upon Thomasson's death. The legal title to the real properties passed to the trustee, [730] both the corpus and the income therefrom being subject to certain liability for debts and legacies (RSMo 1949, Secs. 462.280, 463.150, V.A.M.S.), and subject to any rights the executor may have had to subject the trust assets, both corpus and income, to liability for payment of estate and inheritance taxes under Section 6 of the will. The will vested in each

individual annuitant the right to receive each year (for life or twenty years) semiannual installments, payable out of the trust's net annual income. And there was vested in the State the rights: To receive each year, payable semiannually, the balance of such net annual income for twenty years; thereafter, to receive the entire net annual income until the properties were sold; then, to receive the trust corpus itself. "The law favors vested estates, and one of the recognized rules of construction is that an estate will be held to vest at the earliest possible moment of time, which ordinarily is immediately upon the testator's death, unless a clear and certain intention to the contrary is manifested in the will." Miller v. Kriner, (Mo.) 247 S. W. 2d 757, 761[2, 3]. See also In re Hughes' Will, 363 Mo. 389, 251 S. W. 2d 94, 99[6]. "Plaintiffs maintain, and we think correctly so, in accordance with the great weight of authority, that, where a bequest of the use or income of property, whether in the hands of a trustee or not, is given by a will or deed to a person for life, with remainder over, the right to such use or income begins at the date of the testator's death, unless there is something in the will to show a contrary intent. Where income-producing property, as here, is given by the will to a trustee with directions to pay over the income to named parties, it will be presumed that the testator intended the benefit to begin at once and not to be postponed to a later date, such as the termination of the administration, unless a contrary intent is made to appear." Estey v. Commerce Trust Co., 333 Mo. 977, 64 S. W. 2d 608, 613[1]. See 54 Am. Jur., Trusts, Sec. 100, p. 92.

Obviously, Thomasson intended and believed that his trustee could and would start paying six months after his death, and thereafter continue paying for twenty years, the semiannual installments out of trust income, viz., the real estate rentals and, after final settlement of the probate estate, income realized from the residue of the personal property. However, Thomasson left little personal property. Under probate court orders, four of the real properties were sold and the proceeds of such sales, and also the rentals from two buildings, were used to discharge demands against the probate estate and to pay estate and inheritance taxes and costs of administration. The trustee did not gain possession or control of any real property until January 1, 1951, nearly eighteen years after Thomasson's death. No payments whatsoever have been made to either the individual annuitants or to the annuitant State.

The original inventory in the probate estate listed no cash. It listed choses in action "of doubtful value," four vacant lots in St. Louis County and two buildings in St. Louis City. One building is located at Washington Avenue and Broadway. It was under lease until August 1, 2004, at $18,000 annual rent, the lessee paying all taxes, insurance and maintenance and repair costs. The building is an integral part of a larger building owned by three different owners.

There was evidence as to its condition; the terms of the lease and the sublease; the assessed valuations (land and building separately); appraised value ($260,000 by "capitalization method," $300,000 by "comparison approach"); and current real estate market conditions. The other building is located at McPherson and Euclid Avenues. It yielded only a small net rental and was sold in the foreclosure of a deed of trust Thomasson had executed.

Thomasson's estate was first administered by two administratrices, next by the bank as administrator pendente lite during the will contest suit, and then by the bank as executor. Under probate court orders, these respective personal representatives had charge of the real property, sold the four lots and collected the rentals from the Washington Ave. building between March 6, 1933, and December 31, 1950, and the net rentals from the McPherson Ave. building until Thomasson's deed of trust [731] was foreclosed. Up to February 20, 1951, the representatives had realized from the real properties: $9950, lot sales; $1684.85, McPherson Ave. building rentals; and $347,000 (including $23,750 accrued at the time of Thomasson's death), Washington Ave. building rentals. From these three sources, the representatives received $358,634.85 of their total receipts, $366,122.87. As of February 20, 1951, the representatives had expended $343,881.97 in payment of claims, taxes, interest and administration costs. And as of that date, all claims, taxes and most of the administration costs had been fully paid and the balance in the executor's hands was $22,241.08.

The trial court found and decreed that: Thomasson's intent was that payment of the semiannual installments to the individual annuitants begin on July 28, 1933; the annual net income of the trust estate was sufficient to pay the installments but had been "diverted to the payment of debts, claims and expenses of administration" of the probate estate; the installments bore 6% interest from the time they were payable; the bank, as trustee, should examine its executor's accounts, allocate its executor's receipts and disbursements between trust capital and trust income and "adjust" its trustee's accounts accordingly; there being "insufficient personal property in said estate * * * in order to carry out the intention and purpose of the testator, it would be to the best interests of all creditors, legatees and beneficiaries of the estate to sell all real property in the estate forthwith." The legacies were held to be charges "against all the assets of the estate of Hugh W. Thomasson, deceased," and the bank, as "executor and trustee," was ordered to pay same, with interest, "out of the general assets of said estate." The bank, as "trustee," was ordered to pay to the individual annuitants all of the semiannual installments, with interest, "out of the general assets of the estate or the proceeds from the sale of" the Washington Ave. building, and "to apply all current income received from and after January 1, 1951," to payment

of the installments payable "on January 28, 1951, and thereafter." The bank, as "trustee," was ordered to sell the Washington Ave. building "at either public or private sale in the discretion of the trustee, for the best price obtainable, subject to the approval of the court * * * not later than six (6) months from the date of the filing of this decree"; and to pay, with interest, both the legacies and all of the semiannual installments. The decree's provisions as to attorneys' fees are hereinafter mentioned.

The parties have stipulated that the portions of the decree relating to the bequests to the hospitals be affirmed; that these bequests, together with interest thereon from January 28, 1934, be paid by the executor out of the funds on hand as soon as the probate court makes an order of distribution; and that the decree be modified accordingly. The decree should be so modified.

As stated, the probate court ordered the sale of the lots for payment of debts and legacies. RSMo 1949, Sec. 463.150, V.A.M.S. And, under that section, the probate court was authorized also to order the sale of the two buildings for those purposes. However, no such order was made, and the successive personal representatives were ordered to rent the two buildings and apply the rentals in payment of debts. RSMo 1949, Sec. 462.280, V.A.M.S.

The use of the rentals, and of the proceeds of the sales of the lots, in discharge of claims and payment of taxes and administration costs was not a "diversion of trust funds." The bank, as executor, was required by law and the probate court to collect those specific funds and use them for those specific purposes. The bank, as executor, lawfully collected all of the trust income and sold portions of the trust corpus itself. The bank, as executor, lawfully expended the income realized from trust assets. In the hands of the executor, the trust assets became assets of the probate estate, for the receipt and expenditure of which the executor was accountable to the probate court, not to the trustee (except for the residue on final settlement) or to the trust beneficiaries. The probate court has "no jurisdiction whatsoever over the trust estate or the trustees." [732] In Re Schield's Estate, (Mo.) 250 S. W. 2d 151, 157[6, 7].

Whether the trial court erred in ordering the sale of the Washington Ave. building prior to the expiration of the twenty year period became "moot" on January 28, 1953. However, the decree's provisions requiring the sale at any time prior to January 28, 1958, should be stricken. Thomasson prohibited the sale prior to twenty years, and required the sale not later than twenty-five years, after his death. And he vested in his trustee a wide discretion as to *when* and upon *what conditions* the sale was to be made within the five year period, viz.: "* * * twenty years from and after the date of my death * * * or within a reasonable time thereafter, * * *. as soon as it can effect sales thereof at reasonable prices and upon fa-

vorable terms and conditions, without sacrificing any of the said property * * *." Again: "* * * but I request and desire that my trustee shall hold said property until a favorable sale in its opinion can be made * * *."

"A court in a proper case always has the power to instruct a trustee whether a contemplated act lies within the trustee's discretion. This does not involve exercising the discretion but determining whether it exists. After such fact is determined, the exercise of the discretion is a matter for the trustee. Nossaman, Trust Administration, Sec. 443." Mercantile-Commerce Bank & Trust Co. v. Morse, 356 Mo. 336, 201 S. W. 2d 915, 923[12]. "Where discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court, except to prevent an abuse by the trustee of his discretion." Restatement, Trusts, Sec. 187, p. 479. See also: 54 Am. Jur., Trusts, Sec. 287, p. 228; 65 C.J., Trusts, Sec. 539, pp. 678, 679.

The instant record contains no suggestion that the bank-trustee seeks to betray Thomasson's confidence in its judgment and discretion. On the contrary, the bank's uncontroverted evidence was that the sale-within-six-months ordered by the trial court would probably result in a sale at a sacrifice. As stated in its brief: "The trustee is also concerned, if the property is to be sold, that it be given sufficient latitude to negotiate the sale so that it will not be sacrificed. As appears from the evidence, this property is an integral part of a larger building owned by three different owners. The negotiation of the sale of the property in that situation requires the working up of deals which involve all three of the properties and this cannot be done by sale under the hammer." We hold that, while the trustee's duty is to sell before January 28, 1958, its duty also is to sell at any time prior to that date when, in its judgment and discretion, a sale can be effected under the conditions specified by the testator.

The first of the attorneys' fees involved is the $2500 fee to Stephen A. Boggiano and Meyer Hessel, allowed and taxed as costs in the instant consolidated case in which these lawyers represent two of the three individual annuitants who had been plaintiffs in the will contest case. (See again Townsend v. Boatmen's Nat. Bank of St. Louis, 340 Mo. 550, 104 S. W. 2d 657.) The bank and Mr. Reagan do not challenge this allowance. The State agrees that the allowance is proper if it is determined that these individual annuitants are not estopped to claim under the will. We have hereinbefore held that they are not estopped. The two annuitants filed the first of the instant consolidated cases for construction of the will. The record shows that, for some time prior to filing that suit, they had been urging the bank to file a suit and that the filing of the first suit accelerated the filing of the second. The fee is a trust administration expense, is reasonable and should be taxed as costs in the instant case.

(Charles Claflin Allen, the trustee's attorney in the instant case, testified that he "was asking for no fee whatsoever in this particular suit.")

█ Charles Claflin Allen and Franklin E. Reagan represented the trustee in a suit brought by it to quiet title to the Washington Ave. building, wherein that property was saved as a trust asset. (The facts and issues in the title suit are set out in Boatmen's Nat. Bank of St. Louis v. Rogers, 352 Mo. 763, 179 S.W. 2d 102.) In the title suit, the circuit court allowed Mr. Allen [733] $20,000 and Mr. Reagan $7500 "to be paid by the trustee out of the principal or income of the trust estate." In the instant case, the trial court held that these fees were "debts against the trust estate, chargeable against and payable out of the general assets of said estate." The parties have here stipulated that the $20,000 Allen fee shall be paid without interest; that the $7500 Reagan fee, and $2500 interest thereon, shall be paid without (further) interest; and that the decree be modified accordingly. So the issue as to these two fees is how and when they should be paid. Mr. Reagan contends that, as the fees were allowed by the court (in the title suit) as a trust estate administration expense, he should be paid before any distribution is made to any of the trust beneficiaries.

In the instant suit, the bank-trustee asked the court to "fix a reasonable fee for the services of its counsel in the will contest." (See again Townsend v. Boatmen's Nat. Bank of St. Louis, 340 Mo. 550, 104 S. W. 2d 657.) The bank had employed Mr. Allen and the late Sears Lehmann to represent it, as devisee-trustee, in the defense of the will. The agreement was that the fee was contingent upon sustention of the will and the trust, in which event a reasonable fee, as determined by the court, was to be paid after the probate estate was closed and the trustee came into possession of the real property. Mr. Allen testified as to the services which he and Mr. Lehmann rendered. Fred J. Hoffmeister, a lawyer of thirty-seven years' experience and a former circuit judge, testified that, in his opinion, $20,000 would be "a very reasonable fee." The trial court refused to determine this matter, and ruled that the fees of the trustee's attorneys "for services rendered either heretofore or hereafter" and "any adjustment for additional counsel fees may be made at the time of the termination of the trust."

It is not here contended either that Mr. Allen and the Sears Lehmann estate are not entitled to compensation or that $20,000 is not reasonable nor a trust administration cost. We have carefully studied Mr. Allen's and Judge Hoffmeister's testimony and have examined Volume I of the printed abstract of the record in the will contest case, an instant exhibit. We find that $20,000 is reasonable and should be allowed. As in the preceding instance, the issue as to this fee now is how and when should it be paid.

The State concedes that Mr. Allen and the Sears Lehmann estate are entitled to compensation for the "splendid services rendered in maintaining the will and assisting in upholding the judgment of the trial court upon appeal to this court." The State calls attention to the cooperation given by the State's counsel, representing the residuary trust beneficiary, in the will contest suit; also that the trial court refused the State's proffered evidence of legislative appropriations[2] "for the purpose of protecting the State's interest in and right to the real and personal property devised by Hugh W. Thomasson, deceased," and the State's proffered evidence of the State's expenditures between 1935 and 1946 "for expenses of litigation relating to the Hugh Thomasson estate." The will contest suit was decided by this court in 1937, and there was no offer of proof as to "litigation" after 1937 in which the other expenditures were claimed to have been made nor was there any evidence tending to show that such other expenditures were for the benefit of the entire trust estate.

"When a trustee acts in good faith and in the interest of the trust estate he represents, he has the right to employ an attorney of his own selection, without interference from any of the beneficiaries. Under these conditions, if a beneficiary voluntarily employs an attorney to assist in prosecuting or defending a claim against the trust estate, the beneficiary would be individually liable for the attorney's fees and not the trust estate." Trautz v. Lemp, 334 Mo. 1085, 72 S. W. 2d 104, 110[9, 10]. In Blackhurst v. Johnson, (C.C.A.8th), 72 F. 2d 644, 648 [13, 14], it was said of a trust beneficiary's claim for allowance of an attorney's [734] fee: "When the trust was attacked she might defend or not, as she deemed best, but there is no reason why her attorney's fee should be paid out of the trust estate."

The manner and time of payment of both the $20,000 Allen fee in the title suit and the $20,000 Allen-Sears Lehmann estate fee in the will contest has been simplified in one respect. Both below and here, the bank-trustee stated it is not insisting upon full payment of either fee out of the first trust income funds available; on the other hand, it is unwilling to postpone full payment of the fees until after the annuitants have been paid in toto. The bank-trustee proposes that both fees "be paid as a percentage of the trustee's collections so that they would be paid as the money is received and as the beneficiaries are paid." Below and here, Mr. Allen, speaking for himself and the Sears Lehmann estate, joined in that recommendation.

■ *As to the individual annuitants.* As the trust has had an annual income since January 1, 1951, the individual annuitants are entitled to the following payments, with 6% interest, compounded

(2) See 1935 Laws, Sec. 13, p. 19; 1937 Laws, Sec. 13, p. 27; 1939 Laws, Secs. 121, 130, pp. 169, 173; 1943 Laws, Sec. 50, p. 244; 1945 Laws, Sec. 46, p. 208.

semiannually: (a) A pro rata share of the net income between January 1, 1951, and January 28, 1951, the end of the eighteenth trust year; (b) the installments payable during the last two trust years (January 28, 1951—January 28, 1953), viz., July 28, 1951, January 28, 1952, July 28, 1952, and January 28, 1953. We believe the allowance of interest on these installments is proper as the trustee had sufficient trust income funds with which to pay the installments when they became payable.

We concur in the trial court's rulings that the individual annuitants are entitled to the installments for the first eighteen trust years and directing the trustee to pay same out of annual net income received after January 1, 1951 (over and above that necessary to make the payments mentioned in the preceding paragraph) and the proceeds of the sale of the Washington Ave. building. This: Because Thomasson's clear intent was that the annuities were to be the first charge against the net annual income; because the interests of all the annuitants vested on Thomasson's death and the instant individual annuitants have outlived the twenty year limitation; and because the annual net income from trust assets for each of the first eighteen trust years was sufficient to pay the installments. Nonpayment of the annuities was not due to inadequacy of net trust income. It was the result of the application of the net trust income to purposes other than payment of the installments. (As to payment of a deficiency or arrears in an annuity payable out of income, and the ascertainment of a testator's intent relating to payment thereof out of corpus or subsequent income, see: 3 C.J.S., Annuities, Sec. 5, pp. 1381, 1382; 2 Am. Jur., Annuities, Secs. 16-21, pp. 824-828; Anno. L.R.A. 1917E, p. 580; Anno. 109 A.L.R. 717; McMillan v. Barnard Free Skin & Cancer Hospital, 304 Mo. 635, 264 S. W. 410, 414[4-6].)

So, the situation is one wherein, owing to circumstances not anticipated by Thomasson, strict compliance with the terms of the trust would defeat or prevent the substantial attainment of his purposes. "Nevertheless, circumstances may and frequently do arise where, by reason of changes in conditions not foreseen by the trustor at the time of his execution of the instrument, his ultimate purpose will be defeated unless deviation is permitted; and in such an instance a court of equity has jurisdiction to grant the necessary authority. The court's jurisdiction may be invoked, not only to preserve the estate from loss or destruction, but also, as here, where literal compliance has become impossible. In this situation, where the trust instrument cannot be interpreted as permitting the trustee to do the act desired, the court does not hold that he has the power to deviate, but holding that he lacks the power, confers the same upon him. In so far as may be the court puts itself in the trustor's place, and endeavors to authorize what it believes that he himself would have authorized if he could have anticipated the necessity for the subsequent alteration of

his plan. Seigle v. First National Co., 338 Mo. 417, 431, 90 S.W. 2d 776, 781, 105 A.L.R. 181; 54 Am. Jur., Trusts, Sec. 284; 65 C.J. 683, 684; [735] 2 Scott on Trusts, Sec. 167; 3 Bogert, Trusts and Trustees, Part 1, Secs. 561, 562.'' St. Louis Union Trust Co. v. Ghio, 240 Mo. App. 1033, 222 S.W. 2d 556. See also Restatement, Trusts, Sec. 167, p. 415; Anno. 80 A.L.R. 117.

It follows that we, as a court of equity, should direct the instant trustee to take such action as will, to the extent possible in the present situation, accomplish Thomasson's purposes. The State (both as an annuitant and as residuary legatee) and the individual annuitants were benefited by the personal representatives' use of the annual net income (produced by the corpus of the trust) to settle claims against the probate estate instead of procuring an early probate court order for the sale of the Washington Ave. building to pay the debts of the probate estate. It is quite clear, from the instant record, that such a sale, and the use of the proceeds thereof to satisfy claims against the probate estate, might have entirely destroyed the trust corpus, leaving nothing now for the individual annuitants or the residuary legatee. In the present circumstances, we believe that it would more nearly accomplish Thomasson's purposes, and would be more in keeping with the principles of equity, to direct the trustee to distribute the annual net income and the corpus of the trust estate in such a way as to pay the individual annuitants the total of the installments provided for in the will, and to pay the balance of all trust assets, both income and corpus (when sold by the trustee), over to the residuary legatee, the State.

Accordingly, the trustee is directed to set up an account for each individual annuitant, in which account the annuitant shall be credited with the total amount, without interest, of his or her annuities for the first eighteen trust years. These accounts are payable out of annual net income after January 1, 1951, and out of the proceeds of the sale of the building. (By ''net income,'' we mean the income remaining after deducting annual administration costs and, of course, any payments—or the amounts of reasonable reserves therefor—which the trustee may hereafter be required to make for items payable out of income by law or under the terms of the will.)

As stated, we are attempting to authorize what we believe Thomasson would have authorized had he anticipated the necessity for altering his plan. Under this view, there is no question involving the applicability and effect of RSMo 1949, Sec. 465.310, V.A.M.S., providing for the payment of interest upon legacies or bequests other than residuary. In other words, in our effort to carry out, as nearly as we can, what we believe would have been Thomasson's desires had he anticipated the course of events following his death, our allowance of principal upon the individual annuities for the first eighteen years is an equitable substitution for the provisions of his will. Payment

of the individual annuities, totaling $4600, was not Thomasson's *sole* purpose. He also intended the annuitant State to receive the balance of the annual net income .(which during the first eighteen years, as it happened, was $13,400, nearly three times the total of the individual annuities). He also intended the State to receive a substantial sum as residuary beneficiary. We are convinced that equitable treatment to the individual beneficiaries does not require allowance of interest upon the installments and that equitable treatment to the State requires that such interest should not be allowed. We so rule.

*As to the State.* A strict application of the terms of the will would entitle the State, as an annuitant, to "all of the rest, residue and remainder of such net income" for the period between January 1, 1951, and January 28, 1953, payable semiannually; also "the surplus income arising from the trust estate" after January 28, 1953, and the time of the sale of the building by the trustee. However, in view of our holding as to payment to the individual annuitants of the unpaid installments, we believe that all such "surplus income" should be applied partly in discharge of such unpaid installments and partly in payment of trust administration expenses. And, of course, the State is to receive the balance of the proceeds of the sale of the Washington Ave. building, viz., that remaining in the [736] trustee's hands after the individual annuitants' accounts and the trust administration costs, including attorneys' fees, have been paid in full. (It is immaterial, so far as the State is concerned, whether those items are paid out of "surplus income" or the proceeds of the sale of the building.)

*As to trust administration costs.* These expenses are payable out of the balance of annual net income received after January 1, 1951 (i.e., the balance remaining after payment to the individual annuitants of the above-mentioned five installments, January 28, 1951—January 28, 1953, both inclusive), and out of the proceeds of the sale of the building. We believe that, as a matter of equity, the trustee should pay both the Allen and Reagan (title suit) fees and the Allen-Sears Lehmann estate (will contest suit) fees thus: Ten percent out of annual net income accruing in each of the two trust years ending January 28, 1952, and January 28, 1953; ten percent out of annual net income accruing annually in each of the years ending January 28, 1954, and each year thereafter until the three fees are fully paid or until the building is sold, in which latter event, any unpaid balance or balances shall be paid out of the proceeds of the sale.

The trustee's fee or fees shall be fixed by the court in the event the trustee, the individual annuitants and the State are unable to agree thereon. See Restatement, Trusts, Secs. 242, 244, pp. 740, 752, and cases discussed in Mo. Annotations thereto. The instant bank-trustee has committed no breach of trust. Absent such a breach, "the trustee is entitled to compensation out of the trust estate for his services as

trustee, unless it is otherwise provided by the terms of the trust or unless he agrees to forego or waives compensation.'' Restatement, Trusts, Sec. 242, p. 740; and see Sec. 243, p. 750. See also Cockrell v. First Nat. Bank of Kansas City, 357 Mo. 894, 211 S. W. 2d 475, 478; Lipic v. Wheeler, 362 Mo. 499, 242 S. W. 2d. 43, 50[12]. As in the instance of the attorneys' fees, any unpaid trust administration expenses, including trustee's fees, shall be discharged after the sale of the building and prior to final settlement of the trust estate and distribution of the trust corpus to the State.

The judgment is reversed and the cause is remanded with directions to enter judgment, as of the date our mandate is received, in conformity with the views expressed in this opinion, and to retain jurisdiction of the cause for the purposes of supervising further administration of the trust and distribution of its final net assets to the State. As the costs of the instant appeals are proper trust estate administration expenses, such costs are taxed against the appellant bank-trustee. See St. Louis Union Trust Co. v. Ghio, 240 Mo. App. 1033, 222 S. W. 2d 556, 562[5]. *Van Osdol, C.,* concurs; *Coil, C.,* not sitting.

PER CURIAM:—The foregoing opinion by LOZIER, C., is adopted as the opinion of the court. All the judges concur.