CENTERRE TRUST COMPANY, f/k/a St. Louis Union Trust Company, as Trustee under Trust Agreement Dated January 1, 1956, between the City of East St. Louis and St. Louis Union Trust Company, Plaintiff-Respondent,

v.

JACKSON SAW MILL COMPANY, et al., Defendants-Respondents,

and

The Dr. Martin Luther King, Jr., Bridge Improvement Corp., Intervenor/Defendant-Respondent,

and

Harvey Berlin, Paul Cinquegrana, David Pear, Don Wheeler and William Mann, Intervenors/Defendants-Appellants.

No. 52805.

Missouri Court of Appeals, Eastern District, Division Two.

July 21, 1987.

Motion for Rehearing and/or Transfer Denied Sept. 2, 1987.

Application to Transfer Denied Oct. 13, 1987.

---

Michael D. O'Keefe, St. Louis, for appellants Berlin, Cinquegrana, Pear, Mann and Wheeler.

John M. Hessel, St. Louis, for Dr. Martin Luther King, Bridge Imp. Corp.

Thomas S. McPheeters, Thomas C. Walsh & Michael McKinnis, St. Louis, for Centerre Trust Co.

REINHARD, Judge.

Intervenors/defendants, members of the certified class of bondholders, appeal from a decree in equity approving an agreement reached between the class representatives and The Dr. Martin Luther King, Jr., Bridge Improvement Corporation and issuing instructions to Centerre Trust Company, the trustee under the bridge revenue trust agreement. We affirm as modified.

The issues presented cannot be fully understood without an examination of the history of the Dr. Martin Luther King, Jr., Bridge (hereinafter "bridge" or "King Bridge") and the bridge bonds involved in this dispute. The King Bridge was built in 1951 and spans the Mississippi River between East St. Louis, Illinois and St. Louis, Missouri. On January 1, 1956, the City of East St. Louis, Illinois issued Bridge Revenue Refunding and Improvement Bonds and Coupons with an aggregate principal amount of $15,500,000 to retire outstanding bridge revenue bonds and finance the construction of bridge improvements. The bonds were payable solely from the toll revenues generated by operation of the bridge. Bonds maturing in the years 1958 to 1968 bore an interest rate of 3½% per annum, bonds maturing in the years 1969 to 1980 bore an interest rate of 3⅝%, and bonds maturing in 1985 bore an interest rate of 3¾%. Most of the bonds were bearer bonds with coupons.

The bridge was financially successful until the toll-free Poplar Street Bridge opened in 1967, diverting traffic from the King Bridge. From 1967 to 1974 the trustee avoided default by utilizing the reserve fund to make payments of principal and interest on the bonds; however, with no money available for maintenance and repair, the bridge began to deteriorate. By 1974 it was apparent to the trustee that the anticipated toll revenue and the money remaining in the reserve fund were inadequate to make the payments of principal and interest on the $7,275,000 in aggregate principal amount of the bonds then outstanding. Although sufficient funds remained to make the interest payments due on January 1, 1974, the trustee could not pay the principal on bonds maturing on that date.

On July 8, 1974, the trustee instituted a class action suit seeking a judgment declaring whether the funds it then held and funds it obtained in the future should be distributed to the bondholders in the order of the maturity of their bonds or pro rata and awarding "such further and supplemental relief as may be necessary or appropriate." The court determined that the suit was "properly brought and maintained as a class action under the provisions of Rule 52.08 of the Missouri Rules of Civil Procedure," and the named defendants were found to comprise a representative cross-section of the class and be appropriate representatives of the bondholders. Despite being given an opportunity to do so, no bondholder elected to be excluded from the class.

The court entered its judgment on December 2, 1975, and found:

that under present circumstances and conditions, there is no reasonable likelihood that future revenues from Bridge tolls will be sufficient to provide funds for ... repairs and maintenance and for the payment of interest on the Bonds or for the retirement of the Bonds, either at their scheduled maturity dates or in the foreseeable future. Short of governmental action, which the Court finds has been sought by defendant City and by other interested parties without success, it appears to the Court that no practicable method exists by which the Bridge can be properly repaired, painted and maintained and the Bonds can be paid.

In light of the circumstances, the court utilized "equitable principles" and ordered that "the funds now held by plaintiff Trustee and those which may hereafter be received by it" should be distributed on a pro rata basis and applied to payments of interest before principal, "subject to any necessary subsequent order by the Court." The court also modified and equalized the interest rates in order to treat all bonds "on a parity." The court further stated that it was retaining jurisdiction of the cause "for the purpose of further declaring the rights of the various classes of Bonds and the duties of the Trustee...." No one challenged that decree and the trustee distributed the funds it then held according to the court's order. After that disbursement in late 1975, no further payment of interest or principal on the bonds was made.

On January 27, 1986, Governor Ashcroft of Missouri and Governor Thompson of Illinois appointed a five-member St. Louis-Mississippi River Bridges Panel charged with the responsibility of addressing the problem of bridge access in the metropolitan St. Louis area. The panel issued a report stating that the King Bridge was in extremely poor condition due to a history of limited maintenance and repairs and recommending that the States of Illinois and Missouri acquire jurisdiction over the bridge and incorporate it into the interstate highway system after the obligations to bondholders are resolved, the tolls eliminated, and the bridge restored to a condition of good repair. The bridge had deteriorated to such an extent that the two outer traffic lanes had been closed and weight restrictions imposed because of safety concerns. An engineering study conducted by Sverdrup Corporation indicated that at least $10.5 million would be required to repair the bridge, and without those repairs the entire bridge would eventually have to be closed.

On June 16, 1986, the Dr. Martin Luther King, Jr. Bridge Improvement Corporation (hereinafter "Corporation") was formed as

a non-profit organization for the purpose of obtaining funds from local governmental agencies to acquire, compromise, defease and discharge the bonds and thereby permit jurisdiction of the bridge to be conferred on the States of Missouri and Illinois. The corporation examined the market price for the bonds, which had dropped as low as 6¢ to 8¢ per $1 face value, and entered into discussions with some members of the Bondholders Committee, which had been formed to "get a settlement on the bonds" and was composed of five bondholders, including William Acree, who is one of the designated class representatives,[1] as well as appellants Don Wheeler and William Mann. After members of the Bondholders Committee indicated dissatisfaction with offers of $1.2, $1.5, and $2 million, the Corporation secured pledges from various agencies totalling $4,025,000 and made a tender offer to the bondholders of $4 million on August 15, 1986.[2] According to the terms of that offer, approximately $550 was to be paid for each tendered $1000 bond. Because not all bonds were expected to be tendered, a surplus of $975,000 was anticipated after payment of the $550 to tendering bondholders. The original tender offer provided that the excess funds would be deposited "with the Court to compromise and settle the Bonds and Coupons which are neither tendered pursuant to the offer nor terminated pursuant to the Corporation's litigation." The entire offer was subject to the condition that all of the bonds be acquired, defeased, or otherwise discharged. The City of East St. Louis, in consideration for the Corporation acquiring or discharging all of the bonds, was to transfer title to the Bridge to the Bi-State Development Agency of the Missouri-Illinois Metropolitan District, and Bi-State was to take the steps necessary to transfer title to the States of Missouri and Illinois, including making the required repairs.

Bondholder and class representative Hans Wiegert, who was active in the negotiations, testified that appellant Mann indicated approval of that initial tender offer because he believed the surplus fund "would leave enough money for [him] to get full price for the bonds." However, Wiegert and class representative William Acree objected to the initial offer because of the possibility that some bondholders would receive more money than others and *an agreement was reached which provided that the surplus funds be distributed pro rata to all tendering bondholders.* Acree and Wiegert approved of the offer as amended, believing it was the "best deal" available and treated the bondholders equitably. Henry Fyfe, the chairman of the Bondholders Committee, also indicated his acceptance of the amended tender offer. However, Wiegert and Fyfe told Ronald Thompson, who was the chairman of the River Bridges Panel and a member of the Corporation's board of directors, that appellants Mann and Wheeler were dissatisfied with the offer.

Thompson testified that he met with Wheeler, who informed him that:

the only way that [the offer] was going to go forward, and yield the necessary condition of having 100 percent of the bonds tendered, is if we were to make a special offer to himself and to Mr. Mann and to one or two others, an offer that would be above the offer that we would make to everybody else.

The corporation declined to "make a special deal" with Wheeler and Mann and proceeded with the tender offer.

On August 15, 1986, the Corporation filed a motion to intervene in the trustee's 1974 class action suit and a petition for declaratory judgment in which it described the history of the bridge and the bonds and set out the details of its tender offer. The

---

1. It is not clear from the record whether Hans Wiegert, also an appointed class representative, served on the Bondholders Committee. Ronald Thompson, who was chairman of the River Bridge Panel and a member of the Corporation's board of directors, testified he was informed Wiegert was on the committee and he had discussions with Wiegert as well as other committee members. Wiegert's testimony also indicates that he was involved in negotiations with the Corporation.

2. Twenty-Five Thousand Dollars was set aside for expenses.

Corporation alleged that it has a direct and immediate claim in the subject matter of the litigation and that it

is so situated that the disposition of the action without Corporation will, as a practical matter, impair or impede its ability to protect its interest and, alternatively, that the proposed Petition and the main action have a question of law and fact in common.

The Corporation's motion to intervene was granted on August 22, and the court ordered that notice be published informing bondholders about the intervention and hearing on the petition for declaratory judgment. Bondholders were advised that if they failed to identify themselves to the court, "an order may issue terminating any and all rights, claims, demands, and causes of action whatsoever accruing to them under the trust agreement." The ordered notice did not contain a provision permitting bondholders to opt out of the proceedings. Besides being published in various newspapers, the notice and information pertaining to the tender offer was mailed to all known bondholders.

On August 27, the trustee filed an amended petition for declaratory judgment stating that *"[b]y reason of the events described* in the Petition of intervenor The Dr. Martin Luther King, Jr. Bridge Improvement Corporation, another actual controversy has arisen which requires resolution by this Court, and plaintiff [trustee] is in need of instructions from this Court." The trustee requested that the court issue an order "re-certifying this matter as a class action with current, active bondholders designated as representatives of the class," determine "the rights of all bondholders with regard to the proceeds of the tender offer," issue "instructions to [trustee] as to the most appropriate manner of effectuating its fiduciary responsibilities under the Trust Agreement," and award

"such other and further relief as may be necessary or appropriate." The trustee further requested, "upon the conclusion of this matter, a declaration that [trustee] has duly discharged the duties imposed upon it by the Trust Agreement and, if the trust is thereby terminated, an order relieving [trustee] of any further liability for any actions taken in its capacity as Trustee." The trustee also filed a response to the Corporation's motion to intervene, stating that it did not object to intervention by the Corporation.

It was discovered that of the original class representatives only Jackson Saw Mill still owned bonds, and the Corporation filed a motion for addition of class representatives in which it requested the appointment of Hans Wiegert and William Acree. Wiegert and Acree filed affidavits indicating the amount of their bond holdings, stating that they had tendered their bonds pursuant to the Corporation's offer, consenting to serve as class representatives, and requesting that they be appointed. The court issued an order on September 30, 1986, appointing Wiegert and Acree class representatives and ordering that notice be published informing bondholders that at a hearing on October 30, 1986, "this Court shall determine whether the proposed Settlement Agreement is fair and equitable to all bondholders and shall be binding upon all bondholders." [3]

On October 28 appellants filed a motion to intervene as parties defendant, averring that they were owners of bridge revenue bonds which have been in default since 1974 and had a "substantial economic interest in the subject matter of this action." [4] They described themselves as "non-tendering Bondholders who believe that the Corporation's offer to purchase all Bonds at a fraction of their face value is unfair, unreasonable, and coercive." They further

3. Although termed a "settlement agreement," the document referred to is simply an agreement between the Corporation and the class representatives, including Wiegert and Acree, which reflects the modification of the tender offer provision pertaining to unclaimed funds and the class representatives' acceptance of the amended tender offer. The agreement, dated October 9, 1986, was to become effective upon approval by the court.

4. Appellants, at the time of the hearing, owned 16.65% of the outstanding bonds. Sixty and one-half percent had tendered their bonds, and another 2% expressed their desire to tender.

averred that disposition of the action "may as a practical matter impair or impede their ability to protect their interest in their Bonds" and that their interests were not adequately represented by existing parties. Attached to the motion to intervene was appellants' answer containing affirmative defenses. Appellants' motion to intervene was granted on October 30 and they immediately filed motions to disqualify Judge Koehr and opt out of the class. Judge Koehr granted the motion for change of judge and the cause was transferred to Judge Hamilton, who presided over the scheduled hearing on the "settlement agreement."

At the hearing, testimony was adduced from Acree; Wiegert; Ronald Thompson, the Chairman of the Mississippi River Bridges Panel; and Michael Preston, Commissioner of Capital Improvements for the City of East St. Louis. The deposition of John Whitehead, President of Jackson Saw Mill Company, was also introduced into evidence. Appellants were represented at the hearing by counsel, who conducted cross-examination and made legal arguments. At least some of the appellants, including Wheeler, were present at the hearing; however, appellants presented no evidence and did not testify.

On December 30, 1986, the court entered its decree and found that "this action had been properly brought and maintained as a class action generally under Mo.R.Civ.Proc. 52.08" and "specifically ... this action is an appropriate class action under Mo.R.Civ. Proc. 52.08(b)(1), and, therefore, all holders of Bonds will be bound by the judgment herein." The court denied appellants' motion to opt out. The court found that it had jurisdiction over the proceedings, citing the provision of the 1975 order retaining jurisdiction and stating that further instructions had been requested by the trustee and were necessary. The court declared that the tender offer price represents a "fair and equitable settlement of the rights" of all bondholders and approved the agreement. The court established a claims period, expiring 90 days after the order, during which bondholders would be paid in accordance with the agreement. Upon payment

of the entire $4,000,000 according to the court-approved agreement, the trustee was to be obligated, upon demand of the City of East St. Louis, to release the Trust Agreement as provided in § 12.01 thereof. The court further ordered that:

Within 90 days after the close of the Claims Period the Plaintiff/Trustee shall file its accounting herein of all payments which have been made under this order and upon approval of such report the Court will enter its order that the Plaintiff/Trustee has duly discharged the duties imposed upon it by the Trust Agreement and relieving the Plaintiff/Trustee of any liability for its actions taken in its capacity as trustee.

On January 21, 1987, appellants filed a motion to modify and vacate judgment pursuant to Rule 75.01 in which they asserted that they had proposed an alternative offer to purchase the bonds. Appellants requested that the court postpone the effective date of its judgment for 45 days and compel the Corporation to permit all bondholders to tender their bonds to appellants. They further requested that, if more than 50% of the bonds were tendered or submitted to them, the judgment be vacated in its entirety and a decree issued compelling the City of East St. Louis to turn over management of the Bridge to appellants. On January 23, appellants filed another motion to modify the judgment in which they requested that the court delete the portion of the judgment which provided that the trustee will be discharged from liability upon filing an accounting which is approved by the court.

A hearing on appellants' motions and the Corporation's motion to set a supersedeas bond was held on January 27. Appellants Wheeler and Mann testified about their plan to manage the Bridge and their offer to purchase bonds. Wheeler explained that his offer to pay $650 per $1,000 bond was conditioned upon being able to control management of the bridge. Wheeler did not disclose at the hearing how he would finance the purchase and declined to express willingness to post security. Mann testified that he intended to personally

manage the bridge and explained how he would operate it. The plan anticipated contributions from the States of Missouri and Illinois for rehabilitation and maintenance of the bridge, but Mann and Wheeler did not indicate how they would obtain government participation.

Wiegert testified that "like all the other bondholders, I like the most [money] I can get"; however, he thought the Corporation's offer was the only one "fit to live with." He pointed out that after distribution of unclaimed funds, tendering bondholders under the approved agreement might receive more than $650 per $1,000 bond. Thompson testified that appellants' management scheme had been considered by the River Bridges Panel and determined to be unworkable. He further testified about the need for a supersedeas bond to insure that financing for the Corporation's offer would be available because a stay of the order could jeopardize the funding commitments made by the various governmental agencies. Appellants' motions were denied, and the court set a supersedeas bond. Appellants elected not to post the bond and brought this appeal.

Appellants raise numerous points and subpoints on appeal which will be combined and summarized as necessary in the interest of clarity.[5]

■ We first address appellants' contention that the court "erred in exercising jurisdiction over the 1986–1987 proceedings in this case...." The court's exercise of jurisdiction was based upon the provision in the 1975 order which stated:

Jurisdiction of this cause is hereby retained by the Court *for the purpose of further declaring the rights of the various classes of Bonds and the duties of the Trustee hereafter, such jurisdiction to be invoked on application by plaintiff Trustee,* or by the holder or holders of 5% in principal amount of the then

outstanding class of Bonds maturing January 1, 1975 or thereafter or the class of Bonds maturing January 1, 1974, but only *in the event conditions may arise in the future which,* either by reason of receipt of a lump-sum payment in extinguishment of all further rights of the bondholders, or by reason of a change in circumstances indicating that future revenues and tolls of the Bridge will in all probability be sufficient to permit full payment of principal and interest on all of the outstanding Bonds, *or otherwise make such further instructions necessary for the protection of the Trustee and all of the bondholders.*

(Emphasis ours.) After quoting that portion of the 1975 order, the court stated:

Under the foregoing provision this Court finds that it is necessary to further declare the rights of the various classes of Bonds and the duties of the Plaintiff/Trustee, that the Plaintiff/Trustee has applied for such declaration by this Court and that conditions have arisen which make further instructions necessary for the protection of the Plaintiff/Trustee and all of the Bondholders.

Appellants contend that the trustee did not properly invoke the court's continuing jurisdiction because "none of the conditions set forth in the [1975 order] for the exercise of such continuing jurisdiction occurred...." We disagree. The 1975 order allows the trustee to invoke the court's jurisdiction in the event conditions arise which "otherwise make such further instructions necessary for the protection of the Trustee and all of the bondholders." The trustee was confronted with conflicting points of view among the bondholders as to whether the tender offer should be accepted and how the unclaimed funds should be distributed. The vast majority of known bondholders favored the tender offer and agreement for pro rata distribution of unclaimed funds; however, had the

---

**5.** Respondents contend that this appeal is moot because title to the bridge has passed to the State of Illinois and because appellants have tendered most of their bonds. According to statements made by appellants at oral argument, Wheeler continues to hold eleven bonds,

Berlin no longer owns any, and the other appellants have each retained one bond for a total of thirteen. We believe this case should be determined on the merits, and therefore deny respondents' motion to dismiss the appeal.

trustee proceeded to take the actions described in the agreement, including distributing the surplus pro rata and releasing the trust agreement, it almost certainly would have encountered claims by appellants that it breached its duty. Thus judicial instructions and a declaration of the trustee's duty were necessary to protect the trustee and the rights of *all* bondholders, including appellants. Appellants' contention that the trustee "faced no conflicting pressures or demands" is preposterous.

Appellants' assertion that the trustee needed no instructions because its duties and obligations are "clearly spelled out in the trust agreement" is likewise fallacious. The trust agreement, the purpose of which has been frustrated by unforeseen economic circumstances, was modified in the 1975 order. While the trustee is obligated to treat the bondholders "equitably," there is obviously disagreement among the parties as to what is "equitable." We believe this is precisely the type of situation the court envisioned in 1975 when it retained jurisdiction and referred to "governmental action" and "lump sum payment." The trial court did not err in finding that conditions had arisen which necessitated further instructions and that the trustee had properly invoked its jurisdiction.

Appellants also challenge the court's order allowing the Corporation to intervene. The Corporation's motion for intervention alleged facts consistent with either intervention of right or permissive intervention and the order granting intervention simply referred to Rule 52.12. Because we believe intervention was properly granted under Rule 52.12(b), we need not decide whether it could have been granted under 52.12(a) as well.

■ Rule 52.12(b), pertaining to permissive intervention, provides that "[u]pon timely application anyone may be permitted to intervene in an action ... (2) when an applicant's claim or defense and the main action have a question of law or fact in common[.]" Permissive intervention is "subject to the trial court's sound discretion," *State ex rel. City of Jackson v. Grimm*, 555 S.W.2d 643, 646 (Mo.App.

1977), and "should be allowed with considerable liberality." *Ainsworth v. Old Security Life Ins.*, 685 S.W.2d 583, 586 (Mo. App.1985). Furthermore,

[t]he statutes relating to intervention are broadly remedial and are intended to facilitate the determination of all related disputes in one proceeding and thereby avoid a multiplicity of actions.

*Bolin v. Anders*, 559 S.W.2d 235, 247 (Mo. App.1977).

■ Both the original action and the Corporation's petition for declaratory judgment involved interpretation of the trust agreement provisions regarding default and remedies as well as questions of fact pertaining to the events surrounding the deterioration of the bridge and the financial status of the bonds. We note that the trustee's 1986 petition for instructions involved questions of fact and law which are nearly identical to those raised by the Corporation. Both were concerned with the enforceability of the agreement between the Corporation and the bondholder representatives and the trustee's duties in regard to that agreement. We cannot say that the trial court abused its discretion in permitting the Corporation to intervene.

We must also correct a misconception which pervades appellants' entire brief and accounts for the vehemence with which they protest the Corporation's intervention. Appellants state that "[t]he primary consequence of the Corporation's improper intervention herein is that the Circuit Court erroneously assumed jurisdiction over the 1986–1987 proceedings." As previously noted, the court's assumption of jurisdiction was predicated upon *the trustee's* petition. The trustee's petition and the court's jurisdiction were dependent not upon the Corporation's petition, *but upon the recent events and circumstances to which the petition referred.* The Corporation's intervention was certainly not a prerequisite for the trustee's invocation of the court's retained jurisdiction.

Appellants next challenge the court's approval of the "settlement agreement," contending that the trust agreement prohibits a reduction of the amount due on the

bonds. In support of their argument appellants cite § 11.02 and § 12.01 of the trust agreement. Section 11.02 authorizes the holders of two-thirds or more of the outstanding bonds to agree to modify, alter, amend, add to, or rescind the provisions of the trust agreement,

> provided, however, that nothing herein contained shall permit, or be construed as permitting (a) an extension of the maturity of the principal of or the interest on any Bond issued hereunder, or (b) a reduction in the principal amount of any Bond or the redemption premium or the rate of interest thereon,....

Section 12.01, pertaining to defeasance, provides in pertinent part:

> If, when the Bonds secured hereby shall have become due and payable *in accordance with their terms or otherwise as provided in the Trust Agreement ...,* the whole amount of the principal and interest ... shall be paid *or sufficient moneys shall be held by the Trustee ... for that purpose ...,* then and in that case the right, title and interest of the Trustee shall thereupon cease ..., and the Trustee in such case, on demand of the City, shall release the Trust Agreement....

(Emphasis ours.) However, §§ 8.03 and 8.09 of the trust agreement, pertaining to remedies, authorize equitable relief. Section 8.03 states:

> *Upon the happening and continuance of any event of default* specified in Section 8.02 of this Article, then and *in every such case the Trustee may proceed,* and upon the written request of the holders of not less than ten per centum (10%) in principal amount of the Bonds then outstanding hereunder shall proceed, subject to the provisions of Section 9.02 of this Trust Agreement, *to protect and enforce its rights and the rights of the bondholders under the laws of State of Illinois, or under this Trust Agreement by such suits, actions or special proceedings in equity or at law, or by*

proceedings in the office of any Board or officer having jurisdiction, either for the specific performance of any covenant or agreement contained herein or in aid or execution of any power herein granted or *for the enforcement of any proper legal or equitable remedy, as the Trustee, being advised by Counsel, shall deem most effectual to protect and enforce such rights.*

(Emphasis ours.) Section 8.09 provides:

> No remedy herein conferred upon or reserved to the Trustee or to the holders of the Bonds is intended to be exclusive of any other remedy or remedies, and each and every such remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute.

■ We believe equitable remedies are authorized by the trust agreement, notwithstanding the sections cited by appellants.[6] The "prohibition" appellants read into § 11.02 is, in our opinion, simply a limitation on the actions *by bondholders* which are authorized by that section. The remedies employed by the court were not prohibited by the trust agreement.

■ A court of equity, of course, has general supervisory powers over trusts administered within its jurisdiction. *First National Bank of Kansas City v. Christopher,* 624 S.W.2d 474, 481 (Mo.App.1981). It has long been established that:

> [C]ircumstances may and frequently do arise where, by reason of changes in conditions not foreseen by the trustor at the time of his execution of the instrument, his ultimate purpose will be defeated unless deviation is permitted; and in such an instance a court of equity has jurisdiction to grant the necessary authority. The court's jurisdiction may be invoked, not only to preserve the estate from loss or destruction, but also, as here, where literal compliance has become impossible. In this situation, where the trust instrument cannot be

---

**6.** We note that the court employed equitable remedies in 1975 without objection and modified provisions of the trust agreement.

interpreted as permitting the trustee to do the act desired, the court does not hold that he has the power to deviate, but holding that he lacks the power confers the same upon him.

*Bolles v. Boatmen's National Bank of St. Louis,* 363 Mo. 949, 255 S.W.2d 725, 734 (1953). As was noted in the 1975 order, literal compliance with the trust is impossible because, for reasons unforeseen in 1956, the revenue funds are not, and never will be, sufficient to meet the bond obligations and bridge maintenance costs. Equitable remedies were appropriate in 1975 and are appropriate now. The Corporation's evidence indicated that if the relief requested is not granted, the bridge will be forced to close and the bonds will be worthless. We believe equity permits the action taken by the court.

■ Appellants further assert that the court's approval of the "settlement agreement" was erroneous because the agreement was not "fair and equitable" and was not supported by "valid consideration." We are guided in our review of this contention by the standard enunciated in *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976), and will sustain the court's judgment unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. *Id.*

■ The evidence indicated that the market value of the bonds had dropped as low as $60 to $80 per $1000 bond, and the last public purchase offer was $260,[7] less than half the Corporation's offer of $550. The Corporation's offer is, so far as the record indicates, the only purchase offer involving government funds made since the bonds went into default in 1974. It is apparent that the government funds for the Corporation's tender offer were obtained only through efforts initiated by Governors Ashcroft and Thompson.[8] Ronald Thompson, the chairman of the River Bridges Panel, testified that, in his opinion, no more

government money could be raised to increase the tender offer. Furthermore, the financial problems created by the opening of the Poplar Street Bridge have not been alleviated, they have been exacerbated, and the Bridge's financial and physical condition is critical. If repairs costing at least $10.5 million are not made, the Bridge will be forced to close and the bonds will be worthless. It is hardly surprising that the bondholders favored the agreement and accepted the tender offer by a margin greater than three-to-one.

Appellants argue that "the only truly 'fair and equitable' price for the Bonds" is the entire amount owed. However, appellants themselves purchased the bonds at a discount, paying approximately 20¢ per $1 face value. They acquired the revenue bonds after 1974, with knowledge that the bond obligations were secured only by the toll revenue and that the bonds were in default. Despite the risk, their investment appears to have been a wise one, since they will make a profit of at least $350 on their $200 investment under the Corporation's tender offer. In light of the evidence concerning the value of the bonds and overwhelming bondholder approval of the Corporation's offer, we believe the court's finding that the agreement was fair and equitable was supported by sufficient evidence, was not against the weight of the evidence, and was not erroneous.

■ Appellants contend, in a somewhat related point, that

The Circuit Court erred in approving the settlement agreement because there was no valid consideration to support such agreement in that (1) there was no bona fide dispute to "settle" between the corporation and the bondholders, (2) the sums owed to the bondholders were liquidated and completely undisputed, and (3) the corporation did not concede or give up anything as part of the alleged "settlement."

---

7. That $260 offer was apparently made by a company appellant Wheeler had a connection with.

8. We note that appellants' plan was dependent upon acquiring government funds as well; however, it is not at all clear that they would be able to obtain those funds.

Appellants' point evinces a misunderstanding of the nature of this litigation. The trustee sought to adjudicate claims between it and the bondholders in its 1986 petition, just as it did in 1974. Here the question to be determined involved application of the trustee's duties under the trust agreement to the actions it was to take under the "settlement agreement," including paying the unclaimed funds pro rata to tendering bondholders and releasing the trust agreement. The question of whether the "settlement agreement" is fair and equitable is pertinent only because by implementing an inequitable or unfair purchase agreement the trustee would be breaching its obligations to the bondholders.

With this in mind we point out that there was a dispute to be settled between the bondholders and the trustee which was resolved by the court-approved agreement. In exchange for receiving $550 per bond plus a pro rata share of unclaimed funds, the bondholders released the trustee from further obligations under the trust agreement, and the Corporation obtained the discharge and defeasance of the bonds in exchange for payment of the tender offer amount. Thus there was consideration on the part of all parties and a dispute which was settled by the approved agreement. Appellants' point merits no further comment.

We turn next to appellants' numerous contentions regarding the class action procedures utilized in this case, most of which merit little or no discussion. They first argue that the court erred in denying their motion to opt out of the class. The right to opt out of a class exists only when the class is certified under Rule 52.08(b)(3), although the court may, in its discretion, grant the right to opt out of classes categorized under another subsection of Rule 52.-08. *State ex inf. Ashcroft v. Kansas City Firefighters Local No. 42*, 672 S.W.2d 99, 121 (Mo.App.1984).

The court in the 1974–1975 proceedings certified the class without designating which subsection of Rule 52.08 was applicable and granted bondholders the right to opt out of the class. None did so. In the 1986–1987 proceedings the court specifically certified the class under Rule 52.08(b)(1) and "declined" to designate the action as one brought under 52.08(b)(3). Appellants do not challenge the original certification of the class, but contend "this case is far more appropriately characterized as a (b)(3) class action than a (b)(1) class action."

■ A class may be certified under Rule 52.08(b)(1) if it meets the prerequisites to bringing a class action specified in 52.-08(a) and:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests[.]

The bondholders have had virtually identical interests in their bonds at least since the 1975 order equalizing the interest rates and treating all bondholders "on a parity" regardless of the maturity dates borne by the bonds they held. The trustee has been ordered to treat all bondholders equitably, and its duty to each bondholder is the same as its duty to the others. Thus an adjudication with respect to the trustee's duty to some members of the class would, as a practical matter, either be dispositive of the interest of other members not parties to the adjudication or create incompatible standards of conduct for the trustee. While there is obviously a difference of opinion among the bondholders, their interests in their bonds are identical and the trustee's duty does not vary depending upon the bondholder. In light of the homogeneity of the class, it appears certification under 52.08(b)(1) was appropriate.

■ Thus we believe that appellants did not have the right to opt out and the court did not abuse its discretion in denying them

that option. However, as far as the present appeal is concerned, the question of whether appellants could opt out is moot because they chose to "opt in" by intervening. Appellants elected to bring themselves before the court as parties and therefore were bound by the judgment entered.

■ Appellants also contend that the class representatives did not fairly or adequately represent the interests of all class members, arguing that the class representatives had interests "directly contrary" to appellants because the class representatives "had already accepted the Corporation's tender offer and tendered their bonds" and that there was collusion between the Corporation and the representatives.

We first note that the question of whether the designated representatives adequately represented the interests of *absent* class members is not presented here. Appellants were before the court as parties and had an opportunity to file motions, present arguments, examine witnesses and adduce evidence. They were even granted a change of judge. We will, however, mention the facts which belie appellants' assertions.

The evidence indicated that class representatives Wiegert and Acree consulted with other bondholders to determine their opinion. Wiegert testified that he contacted each of the known bondholders at least once and made an effort to locate all of the bondholders. Furthermore, both Wiegert and Acree were experienced in the investment business and followed the market price of the bridge bonds. Wiegert owned bonds with an aggregate face amount of $156,000; Acree, $674,000. Thus the evidence indicates that Wiegert and Acree were conscientious in their efforts to ascertain the viewpoints of all bondholders and were informed representatives with a significant interest in the litigation.

Appellants contend that the representatives' interest was contrary to their own. Once again, however, appellants transmogrify a difference of opinion into a conflict of interest. The interest of each bondholder was identical, as Wiegert noted when he testified, "Like all the other bondholders, I like the most [money] that I can get." The negotiations and modification of the tender offer to provide for pro rata distribution of unclaimed funds demonstrate that Wiegert and Acree were not puppets controlled by the Corporation and that they were concerned with insuring that *all* bondholders were treated fairly. Although appellants assert that Mann or Wheeler should have been appointed as class representatives, the record clearly reveals that both men had conflicts of interest and would not adequately represent all bondholders. Wheeler and Mann repeatedly expressed their desire for a "special deal"; we also note that Wheeler indicated interest in purchasing the bonds and Mann wanted to operate the bridge. We have carefully examined the record but do not find support for appellants' contentions of collusion and inadequate representation.

■ We briefly address appellants' contention that the circuit court erred in ordering that, upon the filing of a court-approved accounting, the trustee will be relieved from all liability for its acts as trustee. The trustee requested such an order in its amended petition, and the amended petition squarely presented the issue of the trustee's discharge of its duties and relief from liability. The court determined that the trustee has complied with its duties. We note that appellants had an opportunity to present their still unspecified claims at the hearing on the amended petition and at the hearing on their motion to vacate the judgment. Their point is without merit.

We have carefully considered all of appellants' numerous points and subpoints, whether discussed or not. We modify the judgment provision pertaining to the expiration of the claims period, and hold that the claims period shall expire ninety days after the issuance of a mandate in this case. The judgment is affirmed as modified.

SMITH, P.J., and DOWD, J., concur.